Sung H. Mo
23 Independence Trail
Totowa, NJ 07512
(201)835-4922
sungmo123@gmail.com
Pro Se Plaintiff

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

---

SUNG H. MO and DAE S. SHIM

                Plaintiffs,

    v.

WELLS FARGO BANK, N.A. and HSBC BANK USA,
NATIONAL ASSOCIATION,

                Defendants.

Civil Action No.

**COMPLAINT**

---

Plaintiff Sung Ho Mo and Dae S. Shim state the following by way of Complaint:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Sung H. Mo ("Mo") is an individual residing at 23 Independence Trail, Totowa, New Jersey 07512.

2. Plaintiff Dae S. Shim ("Shim") is an individual residing at 23 Independence Trail, Totowa, New Jersey 07512.

3. HSBC Bank USA, National Association ("HSBC") is the alleged owner of Plaintiffs' mortgage

4. Wells Fargo Bank, N.A. ("Wells Fargo") is the servicer of Plaintiffs' mortgage.

5. This Court has personal jurisdiction over Defendants because Defendants, themselves or through their agents and subsidiaries, transacted business in this District and have committed the acts proscribed by the Complaint.

6.  This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. § 1367.

7.  Venue lies in this District pursuant 28 U.S.C. § 1391 (b) as Plaintiffs maintain the property as their primary residence and the events giving rise to the claims took place in this District.

## INTRODUCTION

8.  On December 5, 2018, a class action lawsuit against Wells Fargo was filed by Alicia Hernandez in the U.S. District Court for the Northern District of California  (Hernandez, et al. v. Wells Fargo Bank, N.A., Case No. 3:18-cv-07354).

9.  Hernandez claimed in her class action lawsuit that she and other Wells Fargo mortgage holders lost their homes to foreclosure after the bank unfairly denied their applications for mortgage modifications. She contended that Wells Fargo did this in violation of the Home Affordable Modification Program (HAMP), enacted in the aftermath of the Great Recession of 2008 that left millions underwater on their mortgages.

10.  The Wells Fargo class action stated that the bank accepted up to $6.4 billion in HAMP Funding, but failed to fulfill its obligations and duties to its customer under HAMP's loan modification program.

11.  According to the Wells Fargo class action lawsuit, the bank developed its own software for verifying borrower eligibility for the program, despite the availability of a federal software. As a result of errors in Wells Fargo's software, the bank improperly foreclosed on hundreds of homeowners, the plaintiff claimed. "Wells Fargo now admits that this software caused systematic miscalculations that led to Wells Fargo wrongfully denying loan modifications to over 870 borrowers who qualified for a loan modification under HAMP."

12.  In 2020, Wells Fargo asked the Court to pause the class action lawsuit, but lost its bid for a stay. The judge determined that the bank failed to show that the plaintiff had not established causation and damages. In addition, the judge did not agree with Wells Fargo's

2

argument that it would suffer significant financial injury if the class action were allowed to proceed. Ultimately, Wells Fargo denied the class action lawsuit's allegations, but agreed to pay $18.5 million to settle the dispute. The Court held the Fairness Hearing on October 7, 2020, and issued an Order for Final Approval of the Settlement on October 12, 2020.

13. On February 15, 2019, a class action lawsuit was filed by Monty and Michelle Coordes in the U.S. District Court for the Eastern District of Washington Spokane Division (Coordes v. Wells Fargo Bank, N.A., Case No. 2:19-cv-00052).

14. The Coordeses said they applied for a mortgage modification after Monty became unemployed in 2010 due to the recession. Their application was reportedly denied due to the Wells Fargo software glitch, resulting in the Coordeses losing their home to foreclosure. Due to these injuries, and Wells Fargo's alleged mishandling of the situation, the family has filed a class action lawsuit against the bank.

15. The couple argued that Wells Fargo knew about the software glitch but concealed it for three (3) years after discovery. According to the lawsuit, the bank "should have reasonably known upon discovery of the software error that the resulting harm would continue for several years," but failed to do this and instead "withheld the information and did not act to repair the credit reports of the Coordeses" and other consumers affected by the breach.

16. Wells Fargo filed a motion to dismiss the case for failure to state a claim, said the judge's order. "Specifically, Defendant argues Plaintiff's CPA claim is an impermissible attempt to enforce the federal Home Affordable Modification Program (HAMP), which creates no private right of action," the judge's order continued. The judge opined that, "construing the factual allegations in the light most favorable to Plaintiffs, these allegations are sufficient to state a plausible claim for relief." In addition, the defendant claimed in its motion to dismiss that the plaintiffs CPA claim was precluded because it looked to enforce the HAMP. But, the court opined that the plaintiffs' claim for relief involves behavior that is related to the defendant's participation in HAMP but is looking to enforce a separate cause of action instead of the actual terms of the

3

HAMP agreement.

17. The judge's opinion stated, "Although this conduct is related to Defendant's HAMP participation, Plaintiffs do not seek to enforce HAMP. Instead, Plaintiffs allege this conduct constitutes unfair or deceptive conduct in violation of the CPA." Thus, the motion to dismiss the case was denied, according to the judge. In March 2020, this class action lawsuit was settled.

18. On December 11, 2019, a class action lawsuit against Wells Fargo was filed by Tracy Dore in the U.S. District Court for the Western District of Pennsylvania (Tracy Dore v. Wells Fargo Bank, N.A., Case No. 2:19-cv-01601).

19. Tracy claimed that the bank miscalculated her mortgage modification, which led to the foreclosure of her home. She claimed that Wells Fargo was required to consider her for a mortgage loan modification based on the mortgage agreement and federal regulations, but failed to do so.

20. The plaintiff claimed that HAMP utilizes a net present value (NPV) to figure out whether it would be beneficial to provide a mortgage modification or whether it would be better to continue with the present terms of the mortgage. The defendant automatically calculated attorneys' fees associated with a foreclosure as one part of the NPV calculation, the plaintiff alleged. However, Tracy stated that these calculations were not correct, which meant that hundreds of NPV calculations were not correct for loan modifications. "Approximately 300 Class members continued to struggle with high mortgage payments that would have been lowered had Defendant correctly calculated their NPV," the lawsuit argued. "Due to this financial hardship, Class members have had to default on loans, take out additional, high interest loans, sell property, and/or file for bankruptcy."

21. The plaintiff claimed that if the defendant's software was not faulty, or if the defendant had just used the government's free software, her NPV calculation would have been different and she would have been accepted into HAMP. Had she approved for a mortgage loan modification, she would not have foreclosed on her home and would have been able to stay in

4

her house, the plaintiff stated.

22. In July 2019, Tracy Dore received a letter from Wells Fargo stating that her mortgage loan modification was erroneously calculated and that she should have been approved for a trial application under HAMP.

23. This HAMP mortgage modification issue is far from the only example of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions. To give just a few more examples:

(a). In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers

(b). In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses

(c). In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac

(d). In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance

(e). In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices

(f). In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers  and charging its mortgage-loan customers excessive rate-lock fees

(g). In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance

24. Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of

HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two (2) 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

25. The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo - leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented - was **also responsible** for Shim and Mo being wrongfully denied the loan modification and facing the wrongful foreclosure action.

## **FACTUAL ALLEGATIONS**

### **A. Wells Fargo deceptively drove Shim into default**
### **Shim thus has never defaulted**

26. This matter relates to the loan servicing violations and deceptive practices rising to the level of fraud which continued during the course of loss mitigation with Plaintiffs and that resulted in the improper commencement of a foreclosure action against Plaintiffs in March 2016 (NJ. Docket No. F-007302-16).

27. In November 2004, Plaintiffs purchased a single family house at 23 Independence Trail, Totowa, NJ for a purchase price of $965,000.

28. On February 22, 2007, Shim executed and delivered to BNY Mortgage Company LLC ("BNY") a promissory note securing the sum of $585,000 for the subject property. The mortgage was executed by Shim and Mo. **See Exhibit A.**

29. On March 12, 2012, Shim executed a loan modification agreement with Wells Fargo. **See Exhibit B.**

6

30. Pursuant to the loan modification agreement, Shim's monthly mortgage payment was $2,376.56 from April 1, 2012 through March 1, 2015.

31. In May 2014, Shim noticed that her May mortgage payment had not been processed or debited from her bank account. Shim reached out to Wells Fargo to see why it was taking so long to process the May payment. Shim was advised to wait until further notice.

32. On June 4, 2014, Wells Fargo processed the May payment.

33. In June 2014, Shim noticed that her June mortgage payment had not been processed or debited from her bank account. Shim reached out to Wells Fargo to see why it was taking so long to process the payment. Shim was advised to wait until further notice.

34. In July 2014, Shim reached out to Wells Fargo to see what had happened to her June mortgage payment. Shim was advised to pay $2,495.39 for June payment including late fee by electronic payment only. Shim immediately sent the payment by electronic payment which was processed on July 21, 2014.

35. Furthermore, Shim was advised that she was no longer eligible to pay the agreed amount of the loan modification agreement because she was "late". Shim was also advised that she needed a verbal Temporary Repayment Plan (hereinafter "TRP") because she made late payments and future payments should be sent by electronic payment only from that time on.

36. In August 2014, Shim reached out to Wells Fargo to find out the status of the verbal TRP and was advised to wait until further notice.

37. In September 2014, Shim reached out to Wells Fargo and was advised to send $3,168.75 based upon the verbal TRP and the payment was immediately sent by electronic payment on September 8, 2014.

38. Shim was advised that her mortgage payments could be different from time to time and Shim needed to contact Wells Fargo to be notified of the amount of the monthly payments.

39. In October 2014, Shim reached out to Wells Fargo and was advised to send $3,168.75. The payment was processed on October 10, 2014.

40. On December 1, 2014, a fee of $800 for the verbal TRP was debited by Wells Fargo without a factual basis and a notice.

41. The fee of $800 was a violation of 12 C.F.R. § 1026.19(e)(2)(i)(A).

42. In the middle of December 2014, Shim reached out to Wells Fargo and was advised to pay $2,376.56 which was the amount of the loan modification agreement dated March 12, 2012. The payment was debited on December 16, 2014.

43. In the middle of January 2015, Shim reached out to Wells Fargo and was advised to pay $2,376.56 which was the amount of the loan modification agreement dated March 12, 2012. The payment was debited on February 3, 2015.

44. In March 2015, Shim reached out to Wells Fargo and was advised to pay $3,969.79. The payment was debited on March 24, 2015.

45. In April 2015, Shim reached out to Wells Fargo and was advised to pay $3,969.79. The payment was debited on April 17, 2015.

46. In June 2015, Shim reached out to Wells Fargo and was advised to pay $3,969.79. The payment was debited on June 9, 2015.

47. In August 2015, Shim received a check of $2,410.95 from Wells Fargo and immediately reached out to the bank. Shim was advised that her verbal TRP failed and she did not need to send the mortgage payments anymore. Then, Wells Fargo suddenly **stopped** accepting payments from her. Shim deposited the check of $2,410.95 on August 26, 2015. **See Exhibit C**.

48. Wells Fargo's unilateral demands to Shim were not in accordance with the loan modification agreement dated on March 12, 2012. As such, U.S. Bank's conduct constitutes a breach of the contract.

49. Wells Fargo improperly began to apply Shim's funds to an unknown "suspense" account. Wells Fargo processed Shim's ontime payments on **different** dates which caused the verbal TRP to fail. Wells Fargo returned a portion of Shim's June payment in the amount of $2,410.95 but withheld the rest of the funds detailing it as a "misapplication reversal." **See Exhibit D**.

50. Shim needs to know the exact default date because it is essential for Wells Fargo to support its claims. Here, there is none of that because these defaults are fictional and created artificially by Wells Fargo. Wells Fargo vaguely alleges that the loan was defaulted on April 1, 2015, but the payment records indicate **otherwise**. The default thus was completely baseless.

51. Wells Fargo unilaterally instructed Shim to send her payments in a confusing and varying manner, thus driving her into default. Thereafter, HSBC commenced a foreclosure action seeking to take Plaintiffs' home. The filing of the foreclosure was **only possible** after Plaintiffs were driven to default on the loan under the verbal TRP.

52. Shim never saw or received the verbal TRP approval document dated on February 17, 2015 that Wells Fargo produced. **See Exhibit E**. In fact, the verbal TRP was performed in 2014 not 2015. Wells Fargo thus produced the fraudulent document.

53. In 2016, HSBC commenced a foreclosure action against Shim alleging that Shim refused to pay in 2015 when in fact its servicer, Wells Fargo, began unilaterally demanding unjustified amounts from Shim and stopped accepting her payments.

54. The verbal TRP was supposed to "cure" any missing or late payments. Instead, the verbal TRP was a way for Wells Fargo to unilaterally impose new amounts, misapply funds and then tell Shim that she was no longer eligible to pay the agreed amounts of the plan because she was "late."

55. Accordingly, Wells Fargo provided Shim with an illusory verbal TRP that caused an automatic lapse in her on time payments and deceptively **drove** her into default. Shim thus has **never** defaulted.

**B. Wells Fargo recklessly denied Plaintiffs their six (6) loss mitigation applications**

56. The Home Affordable Modification Program (hereinafter "HAMP") was created by Congress in response to the subprime mortgage crisis in 2007. HAMP was meant to help homeowners facing financial hardship by lowering their mortgage payments to 31% of their monthly gross income.

9

57. As a HAMP servicer, Wells Fargo was required to consider all eligible mortgage loans for a HAMP modification.

58. HAMP used a net present value (hereinafter "NPV") to evaluate whether it is beneficial to modify a mortgage under the program (NPV positive), or whether it would be better to maintain the current terms of the mortgage (NPV negative).

59. The test result was NPV positive when the total discounted value of expected cash flows for the modified loan is higher than the total discounted value of expected cash flows for the unmodified loan.

60. If the calculation results in an NPV positive result for a qualified applicant's mortgage, then Wells Fargo was **required** to perform a HAMP modification.

61. One component of the NPV calculation was attorney fees associated with a foreclosure. Wells Fargo's NPV calculation software miscalculated attorney fees, resulting in the homeowner's NPV calculations being incorrect for loan modifications.

62. In fact, Wells Fargo was not required to create its own software for HAMP loan modifications. The federal government provided free software to Wells Fargo for the modifications, but Wells Fargo refused to use it, instead using its own faulty software.

63. Wells Fargo should have used the federal government's software in order to avoid erroneously denying homeowners' HAMP loan modifications.

64. Wells Fargo knew as early as 2011 that it failed to properly audit its loan modification software due to oversight by the Office of the Comptroller of the Currency (hereinafter "OCC"), resulting hundreds of homeowners erroneously being denied HAMP loan modifications which they were entitled to under federal law.

65. After the OCC found that Wells Fargo had not adequately overseen foreclosure proceedings, Wells Fargo agreed to a consent decree that ensured its compliance with HAMP. Despite both the decree and Wells Fargo's awareness of its auditing insufficiencies, Wells Fargo did not attempt to fix its faulty software and only discovered the actual software error in August

10

2013.

66. Wells Fargo even then concealed the software error to avoid further scrutiny from OCC and continued to deny hundreds of homeowners HAMP loan modifications.

67. In 2015, the OCC imposed stricter requirements on Wells Fargo after discovering that Wells Fargo was still out of compliance with the consent order, and in 2016 fined Wells Fargo $70 million for its prior failure to properly audit HAMP compliance.

68. Nevertheless, Wells Fargo still failed to fix the software calculation error that they discovered in 2013.

69. In August 2018, Wells Fargo notified the public of the software error that caused hundreds of homeowners being erroneously denied HAMP loan modifications due to the faulty calculation.

70. Shim and Mo applied for HAMP modifications through Wells Fargo, but despite being qualified, Wells Fargo erroneously denied them HAMP loan modifications due to its faulty software.

71. On March 14, 2016, HSBC commenced an improper foreclosure action against Shim and Mo alleging that they refused to pay mortgage in 2015 when in fact it's servicer, Wells Fargo, began unilaterally demanding unjustified amounts from them and stopped accepting the mortgage payments.

72. In December 2017, Shim and Mo submitted their first HAMP loan modification including federal tax returns and bank statements. Their incomes were over $200,000 which was more than enough to be qualified for their expected monthly payments of about $4,500.

73. A few days later, Wells Fargo issued a blanket denial letter without a specific reason or reasons. **See Exhibit F**.

74. On March 5, 2018, Shim and Mo submitted an appeal request including incomes and bank statements. They argued that Wells Fargo's decision was based upon incorrect calculation of their incomes. **See Exhibit G**.

75. On March 23, 2018, only after eighteen (18) days, the appeal was denied without a specific reason or reasons. **See Exhibit H.**

76. In late March, Shim received her property appraisal report as part of loss mitigation. The report which was based on exterior-only inspection was full of inaccurate information and fraudulently prepared because the appraiser adopted significantly different properties as comparable sales and two (2) of the comparable properties were not even sold as of the appraisal date and still were on the market for sale. **See Exhibit I.**

77. The appraiser, Rocco Clementi Jr. conducted a standard appraisal report on February 11, 2018. The appraiser utilized five (5) allegedly "comparable" sales of real property in constructing his appraisal report.

78. Although the subject property is a colonial house with four (4) full baths and one-half bath and contained a fully finished basement, the appraiser fraudulently recorded that it is a ranch house with three (3) full baths and one-half bath and contained an unfinished basement.

79. Although the exterior and front of the subject property were considerably renovated in 2015, the appraiser adopted a photo taken in 2006.

80. "Comparable no.2" located at 16 Hamilton Trail, Totowa, NJ 07512 contained four (4) full baths but the appraiser falsely recorded that the property only contained three (3) full baths.

81. "Comparable no.3" was located at 45 Lafayette Circle, Totowa, NJ 07512. Although the property contained four (4) full baths and one-half bath, the appraiser falsely recorded that it only contained three (3) full baths and one-half bath.

82. "Comparable no.4" was located at 15 Independence Trail, Totowa, NJ 07512. The property wasn't even sold as of the appraisal date and still was on the market for sale. The appraiser absolutely should not have utilized the property as comparable.

83. "Comparable no.5" located at 6 Continental Circle, Totowa, NJ 07512 wasn't even sold as of the appraisal date and still was on the market for sale. The appraiser absolutely should not have utilized the property as comparable.

84. The appraiser intentionally and fraudulently falsified data regarding several properties allegedly "comparable" to Shim's in order to deflate the appraisal value to $820000.

85. In order to assure that Shim would not qualify for the loss mitigation,  Wells Fargo conspired to fraudulently deflate the appraisal value of her home to $820000.

86. As a result of the appraiser's falsification of the appraisal report, Shim and Mo were not approved for the loss mitigation which they should have been qualified for.

87. By falsely deflating the value of the appraisal, Wells Fargo illegally and deceitfully ensured - to Shim and Mo's direct and significant financial, personal, and legal detriment - that they would not qualify for the loss mitigation which they should have qualified for.

88. HSBC and Wells Fargo are liable for the actions of the appraiser.

89. Mo thus sent a letter to Wells Fargo  addressing the issue over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Shim and Mo their loss mitigation based on the fraudulent appraisal report.

90. Both the appraiser's falsifications and Wells Fargo's resultant disapproval and disqualification of Shim and Mo constituted material misrepresentation of fact regarding their actual ability to qualify for the loss mitigation.

91. HSBC, Wells Fargo, and the appraiser, in their individual and collective capacity, took part in planning and aiding both the entirety and individual portions of this fraudulent, deceitful, and illegal scheme.

92. The appraisal report was not prepared based upon the Uniform Standards of Professional Appraisal Practice. Wells Fargo thus violated the 12 CFR part 323, appraisals of the FDIC Rules and Regulations.

93. Wells Fargo thus violated the N.J. Admin. Code § 13:40 A-6.1.

94. On April 9, 2018, Mo faxed a letter to Wells Fargo explaining how the appraisal report was inaccurately prepared and also asking what basis or bases Shim and Mo's modification was denied. **See Exhibit J.** Wells Fargo however did not respond at all, which was motivated by intentional discriminattion.

13

95. On April 10, 2018, Mo faxed the letter again. **See Exhibit K.**

96. On April 21, 2018, Shim and Mo submitted the third complete HAMP loan modification still arguing that Wells Fargo's decision was based on incorrect calculation of their income and fraudulently prepared appraisal report. **See Exhibit L.**

97. On April 26, 2018, **only** after five (5) days, Wells Fargo denied Shim and Mo their third loan modification without a specific reason or reasons. **See Exhibit M**.

98. In early May 2018, Shim and Mo submitted their fourth loan modification application still arguing the incorrect calculations of their income and the fraudulent appraisal value..

99. On May 17, 2018, the fourth modification was denied without a specific reason or reasons. **See Exhibit N.**

100. On June 8, 2018, Shim and Mo submitted their fifth loan modification application still arguing that Wells Fargo's decision was based on incorrect calculation of their income and fraudulently prepared appraisal report. **See Exhibit O.**

101. On June 12, 2018, **only** after four (4) days, the fifth loan modification was denied without a specific reason or reasons. **See Exhibit P**.

102. In early July, Shim and Mo submitted their sixth HAMP loan modification application still arguing the income and appraisal issues.

103. On July 26, 2018, the sixth loan modification was denied without a specific reason or reasons. **See Exhibit Q**.

104. The Consumer Financial Protection Bureau is an agency of the United States government responsible for consumer protection in the financial sector.

105. Pursuant to its 12 C.F.R. § 1024.41(b)(1), a servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application. Wells Fargo nevertheless failed to do so.

106. Pursuant to 12 C.F.R. § 1024.41(b)(2)(B), a servicer shall notify the borrower in writing within five (5) days (excluding legal public holidays, Saturdays, and Sundays) after receiving the

loss mitigation that the servicer has determined that the loss mitigation application is either complete or incomplete. Wells Fargo however failed to do so.

107. Pursuant to 12 C.F.R. § 1024.41(d), if a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower, a servicer shall state in the notice sent to the borrower the **specific** reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria. Wells Fargo nevertheless failed to do so.

108. Wells Fargo failed to exercise reasonable diligence in reviewing the documents and completing the six (6) loan modifications and repeatedly violated the federal loss mitigation procedures. Had Wells Fargo not violated the procedures, or had Wells Fargo reasonably reviewed Plaintiffs' six (6) applications, Plaintiffs could have approved for the loss mitigation and could have received the **benefits** from the federal government.

109. Wells Fargo's faulty software caused Plaintiffs to be denied their six (6) loss mitigations. Had Wells Fargo's software not been faulty, or had Wells Fargo used the federal government's free software, Plaintiffs' NPV calculation would have resulted in a NPV positive result and Plaintiffs could have received the benefits from the federal government.

## C. HSBC's counsel knowingly and willfully did not properly serve the complaint, the motions and the orders on parties of interest and repeatedly made false statements

110. There were a total of seven (7) defendants in the foreclosure action; Dae Sung Shim, Sung Ho Mo, PNC Bank, Santander Bank, N.A., JPMorgan Chase Bank, N.A., United States of America - DC ("U.S.A - DC"), and United States of America - NJ ("U.S.A.- NJ").

111. On December 2, 2016, HSBC's counsel, Phelan Hallinan Diamond & Jones, PC (hereinafter "Phelan") filed a Request for Default against the United States of America and asserted that the U.S.A.- DC was served on April 5, 2016 and the U.S.A.- NJ was served on April 6, 2016.

112. Phelan did serve on the U.S.A.- NJ on April 6, 2016, but did not serve on the U.S.A.- DC on April 5, 2016.

113. After seventeen (17) months from the day it claimed to serve, Phelan knowingly and willfully submitted a fraudulent USPS receipt of the U.S.A. - DC on September 11, 2017 to cover up its non-compliance.

114. On December 8, 2016, Phelan filed a Proof of Mailing Notice of Motion for Entry of Default and asserted, "On December 5, 2016, this office did mail a copy of the said Motion for Entry of Default, by regular and certified mail, return receipt requested, by depositing said pleadings in the United States Mail, to the above defendants at their principal places of business or place of abode." **See Exhibit R.**

115. Phelan however intentionally did not serve on PNC Bank, JPMorgan Chase Bank, N.A., and Santander Bank, N.A. Phelan thus made a false statement and violated R. 4:4-7, and N.J. Stat. § 2A:50-58.

116. On January 13, 2017, the **unopposed** Motion was granted and default was entered against PNC Bank, Santander Bank,N.A., and JPMorgan Chase Bank, N.A.

117. The default however was not entered against U.S.A.- DC and U.S.A.-NJ at that juncture and it **never** has been entered against U.S.A.- DC and U.S.A.- NJ as of this day.

118. The default thus was invalid because it was entered without serving on all the parties of interest in the action.

119. On January 23, 2017, Phelan filed a Proof of Mailing-Entry of Default and asserted, "This office did mail on January 20, 2017, a copy of the filed Request and certification of Default and/or Order for Entry of Default, via regular mail, to the above defendants at their principal places of business or place of residence." **See Exhibit S.**

120. Phelan however deliberately did not serve on all the named defendants except Pro Se Defendant Shim who received the Order via regular mail.

121. Phelan thus made a false statement and failed to comply with N.J. Stat. § 2A:50-58 and Section (6) of the Fair Foreclosure Act.

16

122. On February 7, 2017, Phelan filed a Certification of Mailing of Notice for Entry of Final Judgment and asserted, "On January 20, 2017, this office mail a Notice Pursuant to Section 6 of the Fair Foreclosure Act to Defendant(s) in the above entitled action by  regular mail and certified mail to the mortgaged premises and to any applicable alternate addresses as described below." **See Exhibit T**.

123. Phelan made a false statement because  Shim received the notice via regular mail only and Mo never received the notice.

124. On September 11, 2017, Phelan filed the Motion to Reform the Loan Modification and attached the Certification of Mailing Service made to the Attorney General of the United States of America in Washington, D.C and a copy of the confirmation which claimed that service was completed on April 5, 2016.

125. Phelan in fact knowingly and willfully submitted a fraudulent USPS certified mail receipt since the tracking number still indicates that its label was created, but yet in the system as of July 17, 2021. **See Exhibit U**.

126. The USPS Tracking displayed, "A status update is not yet available on your package. It will be available when the shipper provides an update or the package is delivered to USPS."

127. Phelan realized that it failed to serve the Complaint on the U.S.A. - DC at that  juncture and thus intentionally submitted the fraudulent receipt after seventeen (17) months  from the day it claimed to serve.

128. The Complaint thus was invalid because Phelan failed to serve the Complaint on U.S.A - D.C.

129. Phelan thus intentionally violated R. 4:4-3(a) and committed fraud and forgery.

130. In addition, Phelan filed a certification of filing and service and  asserted, "On September 11, 2017, I did forward, via regular and certified mail, a copy of the Plaintiff's Notice of Motion to Reform the Loan Modification, Attorney Certification with exhibits, and proposed form of Order

17

returnable October 13, 2017 to: Dae Sung Shim, Sung Ho Mo, PNC Bank, Santander Bank, JPMorgan Chase Bank, N.A., United States of America % US Attorney General District NJ, and United States of America % Attorney General." **See Exhibit V**.

131. Phelan however did not serve the Motion on all the named parties of interest in the motion.

132. Phelan thus made a false statement and knowingly and willfully violated R. 4:4-7.

133. As a result, the **unopposed** Motion was granted on November 6, 2017.

134. The Motion thus was invalid because Phelan deliberately did not serve the Motion on all the named parties of interest in the Motion.

135. On November 30, 2017, Phelan filed a Proof of Mailing and claimed, "I, Jaclyn Clark, did mail on November 30, 2017, a copy of the filed order reforming the loan modification agreement and subordinating and divesting Sung Ho Mo of any title and interest she may have in the real estate with respect to completing an rem foreclosure, via certified mail, return receipt requested, and regular mail, to the above defendants at their principal places of business or place of residence." **See Exhibit W**.

136. Phelan nevertheless  intentionally did not serve the Order on all the named defendants in the Order.

137. Phelan thus made a false statement and violated R. 4:4-7.

138. The Motion to Reform the Loan Modification and the Order therefore were invalid because Phelan knowingly and willfully did not serve the Motion and the Order on all the named parties of interest.

139. On August 24, 2018, Phelan filed a Proof of Mailing Consent Order and claimed,"I Jennifer L. Wingfield, did mail on August 24, 2018, a copy of the filed Order Consenting to Vacate Default, via certified mail, return receipt requested, regular mail, and/or lawyer's service to the above defendants at their principal places of business or place of residence." **See Exhibit X**.

18

140. Phelan however intentionally did not serve the Order on Shim and Mo.

141. Phelan thus made a false statement and violated R.4:4-7.

142. On August 29, 2018, Phelan filed a Motion for Final Judgment and asserted, " On August 22, 2018, this office did mail a copy of the within Notice of Motion for Entry of Judgment along with a copy of the Certification of Amount Due, and Certification of Due Diligence, by regular and certified mail, in separate envelopes to the following defendants. Notice has been electronically served by the Court to the following parties: Dae Sung Shim, Dae Sung Shim % Franklin S. Montero,Esq., Sung Ho Mo, Sung Ho Mo % Franklin S. Montero, Esq., PNC Bank, Santander Bank, National Association, JPMorgan Chase Bank,N.A., United States of America % U.S. Attorney General District NJ, United States of America %  Attorney General, and Tenant." **See Exhibit Y**.

143. Phelan nevertheless knowingly and willfully  did not serve the Motion on all the named parties except Shim who received the Motion via regular mail only.

144. Phelan thus made a false statement and violated R.4:64-1(d).

145. On April 1, 2020, Phelan filed the Objection to Shim's motion to stay and asserted that the Notice of Intention to Foreclose ("NOI") dated January 16, 2015 was mailed to Shim and Mo by certified mail, return receipt requested, and regular mail on January 16, 2015.

146. The tracking number HSBC submitted however still indicates that its label was created, but yet in system as of July 17, 2021. The USPS Tracking displayed, "A status update is not yet available on your package. It will be available when the shipper provides an update or the package is delivered to USPS." **See Exhibit Z**.

147. Phelan knowingly and willfully submitted the fraudulent USPS receipt to cover up its non-compliance with New Jersey court. Besides, HSBC did not **even** prepare the NOI for Mo.

148. In fact, Phelan submitted the same document on August 24, 2017, but intentionally **deleted** the tracking number to cover up its non-compliance with the court. **See Exhibit AA**.

149. Phelan thus committed a forgery.

150. In addition, Phelan submitted another NOI dated September 3, 2015 in the motion for summary judgment filed on May 25, 2017, but the NOI was never served on Shim and Mo. The tracking number still indicates that its label was created but not yet in the system as of July 17, 2021. **See Exhibit BB**.

151. The NOI must be sent by regular and certified mail with return receipt requested and cannot be sent more than 180 days before the commencement of the foreclosure action filed on March 14, 2016.

152. However, the NOI was dated on January 16, 2015 which was fourteen (14) months prior to filing the foreclosure action. The NOI thus was invalid.

153. Furthermore, the NOI also must be sent by regular and certified mail with return receipt requested to Mo as well, but HSBC **never even** prepared those two (2) NOIs for Mo.

154. Accordingly, HSBC violated the Fair Foreclosure Act without a doubt.

155. Phelan continually submitted the false statements and knowingly and willfully did not properly serve the Complaint, the Motions and the Orders.

156. Phelan repeatedly made false statements regarding the services even though he knew he did not serve the documents on parties of interest. As such, his conduct constitutes consumer fraud under the New Jersey Consumer Fraud Act.

157. Phelan possessed a legal duty to act with reasonable prudence, caution, and care to avoid and ensure against causing or creating an unreasonable risk of or actual harm to any party in the action including Shim and Mo who were devastatingly affected by his actions in connection with the Motions and the Orders

158. Phelan breached this duty by his negligence and fraudulent business behavior and thus caused Shim and Mo to suffer monetary, legal, and economic harm

159. Phelan's unconscionable, deceitful, and grossly careless actions directly caused Shim and Mo to suffer significant and debilitating loss.

160. Phelan intended to mislead Plaintiffs and induce them to rely on its omissions and

misrepresentation. Phelan's conduct was a deceptive act within the meaning of the common law

fraud as his misrepresentations were deliberate acts to mislead and did **in fact mislead** them.

161. Phelan maliciously and intentionally did so in order to further his own legal and financial

gain without regard to the detriments imposed on Shim and Mo.

162. HSBC is liable for the action of the counsel.

### D.  HSBC is not the owner of Plaintiffs' mortgage and did not have standing
   to commence the foreclosure action in New Jersey court

163. On February 22, 2007, Shim executed a Note to secure a sum of $585000 with BNY.

The Note then was endorsed to Everbank. Everbank subsequently endorsed the Note to Wells

Fargo. The Note then was endorsed in blank. The endorsements were not dated.**See Exhibit A**.

164. On July 26, 2011, Mortgage Electronic Registration Systems Inc (MERS), as nominee

for BNY, assigned Shim and Mo's mortgage to HSBC Bank USA, National Association as

Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates,

Series 2007-11. **See Exhibit CC**.

165. On March 12, 2012, Shim's Loan Modification Agreement indicated that Wells Fargo

was the lender. **See Exhibit B**. Wells Fargo thus **owned** Shim's loan prior to on March 12, 2012

166. On March 14, 2016, the foreclosure complaint was filed by HSBC. HSBC however filed

the action **without** transfer of the loan or assignment of Shim's mortgage from Wells Fargo.

Therefore, HSBC absolutely did not have a standing to commence the action.

167. On May 5, 2020, HSBC's counsel filed an attorney certification stating, "Once said hold

is removed, a Motion to Substitute Plaintiff is required due to a post-complaint Assignment of the

Mortgage." **See Exhibit DD**. HSBC tries to replace the owner **back**  to Wells Fargo, because

HSBC simply has **never** possessed the note.

168. HSBC had not taken any action regarding the Assignment of Shim's mortgage **until**

Shim filed a civil lawsuit against HSBC with this Court on March 9, 2020. All of sudden, HSBC

complained about the Assignment of  the Mortgage to the servicer, Wells Fargo, which made

Shim raise questions regarding the transfer of her mortgage.

169. First of all, Shim need to know (a) when BNY transferred the Note to EverBank; (b) when EverBank transferred the Note to Wells Fargo; (c) when HSBC assigned Shim's mortgage to the unknown owner/investor ("due to a post-complaint Assignment of the Mortgage" must be clarified and proved); (d) who the unknown owner/investor is; (e) whether or not Wells Fargo is the new owner/investor.

170. If HSBC assigned Shim's mortgage to the unknown owner/investor prior to the commencement of the foreclosure action, the action must be immediately dismissed because HSBC was not the owner of Shim's mortgage at the time of filing the foreclosure complaint. If not, then when did it happen? Why didn't HSBC file the Assignment of Shim's mortgage at the time of the transfer?

171. The answer is very simple. This is a clear example of HSBC's unconscionable business practice. It is hard to believe the deceitful ways HSBC, as a national bank, runs its business. Furthermore, it does not matter if the failure was intentional or not. It does not matter if the failure was purposeful or inadvertent because HSBC already abused the state judicial proceedings and has significantly damaged Shim and Mo.

172. Accordingly, HSBC failed to establish a valid chain of title by establishing each transfer. The Assignment of the Mortgage thus could not be used to establish HSBC's standing because HSBC failed to recite all assignments of Shim's  mortgage in the chain required by Rule 4:64-1(b)(10).

173. Here, there was a break in the chain of HSBC's title and no one knows how many times HSBC failed to establish each transfer. Once there is a break in the continuity of the title, numerous scenarios can happen.

174. Furthermore, HSBC failed to prove that it was the holder of the properly endorsed note during the foreclosure action, thus HSBC has not established that it was entitled to enforce note under N.J.S.A. 12A:3-301.

175. For HSBC to have standing to foreclose, it must demonstrate that it is in possession of

22

the note. Deutsche Bank Trust Co. v. Angeles, 428 N.J. Super., 315, 319-20 (App. Div. 2012); Deutsche Bank National Trust Co. v. Michell, 422 N.J. Super., 214, 224-25 (App. Div. 2011). HSBC must demonstrate standing by both a valid assignment of mortgage pre-dating the foreclosure complaint and certifying possession of the Note and providing a copy of the Note. HSBC must present evidence of the recorded Mortgage before the foreclosure complaint was filed, satisfying the requirement that "either possession of the note or an assignment of the mortgage that predated the original complaint confers standing." Deutsche Bank Trust Co. Ams. v. Angeles, 428 N.J. Super. 315, 318 (App. Div. 2012).

176. HSBC nevertheless failed to prove its standing by either possession of the note or an assignment of mortgage that predates the complaint because HSBC failed to demonstrate its physical possession of the note and because its assignment of Shim's mortgage was recorded on August 11, 2011 and the foreclosure complaint was filed on March 11, 2016, thus no one knows how many transfers took place during the four (4) years gap without valid assignments of Shim's mortgage.

177. But most of all, HSBC's counsel palpably specified that HSBC is not the current owner of Shim's mortgage, thus a motion to substitute HSBC is required. This indisputable factual matter clearly indicated that there is a bona fide owner of Shim's mortgage out there and Shim is entitled to know who the real owner is and when the transfer of the Note actually took place.

178. Furthermore, Shim's mortgage loan was **securitized** or pooled with other loans and sold as a package to HSBC Bank  as Trustee for Wells Fargo in return for Asset-backed Certificates, Series 2007-11. Then, a BNY-related entity which was either Everbank or Wells Fargo was to deliver and endorse the original mortgage note to HSBC. However, delivery and endorsement did **not** occur.

179. Subsequently, MERS, in an apparent **effort** to cure the failure to deliver and endorse the mortgage note, and as the nominee for BNY, assigned the mortgage note to HSBC  as Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates,

Series 2007-11 on July 26, 2011. The original mortgage note however **never left** the possession of the BNY-related entity.

180. The enforcement of a note secured by a mortgage was governed by the Uniform Commercial Code (UCC) because the note is a "negotiable instrument" N.J.S.A. 12A:3-104. Under the UCC, a party is entitled to enforce a negotiable instrument if it is "the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder, or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418." N.J.S.A. 12A:3-301.

181. HSBC **never** had possession of the note because it was not delivered and endorsed and therefore HSBC was not a "holder" under the New Jersey UCC. Also preventing HSBC from becoming a "holder" was that there was not a proper endorsement on the note itself, or an allonge that was executed at the time that the proof of claim was filed. HSBC could not be deemed a "nonholder in possession " because it did not possess the note. Finally, HSBC was not a "non-holder not in possession" because it could not satisfy the requisites of lost, destroyed or stolen instruments or payment or acceptance of the instrument by mistake under N.J.S.A. 12A:3-309 and subsection d. of N.J.S.A. 12A:3-418, respectively.

182. Furthermore, in order for HSBC to have the right to foreclose, a debt must be owed to HSBC and HSBC must have a security interest in the property supported by the debt. HSBC must show (a) that HSBC holds the Note, and (b) that the mortgage was assigned to HSBC in writing. N.J.S.A. § 46:9-9. Assignment of the mortgage alone without transfer of the underlying obligation is **ineffective**. "Without the assignment of the debt, which is but evidence thereof, the assignment of the securities confers **no** rights." Johnson v. Clarke, 28 A. 558 (Ch. 1894).

183. It is axiomatic that the mortgage follows the Note. Thus, the principal thing that HSBC must demonstrate is that the debt obligation underlying the mortgage was owed to HSBC such that HSBC has a right to resort to the collateral securing the debt. Furthermore, since the secured obligation is the principal thing and the mortgage that secures it is only an incident

24

which follows and attends the principal, an assignment of the Note evidencing the secured obligation operates as an assignment of the mortgage in equity. <u>Federal Reserve Bank of Phila. v. Welch</u>, 122 <u>N.J.</u> 90, 92 (Ch. 1937).

184. Accordingly, it was palpably clear that HSBC did not have standing to commence the foreclosure action in New Jersey court.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT - THIRD-PARTY BENEFICIARY

185. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

186. HAMP arose out of the Emergency Economic Stabilization Act of 2008, and is administered by Fannie Mae as the agent of the Department of the Treasury. The program requires that all mortgage loans owned or guaranteed by Fannie Mae or Freddie Mac that meet certain requirements be evaluated by the loan servicers for loan modifications. If a borrower qualifies, then the servicer is obligated to modify the loan in accordance with a predefined formula that reduces the borrower's monthly payment to 31% of his gross income for the first five years.

187. Plaintiffs entered into security instruments with BNY in the form of mortgage and promissory note on February 22, 2007. Plaintiffs' security instruments thus were guaranteed, securitized, or owned by a federal government agency such as the Federal Housing Administration or a government sponsored enterprise such as Fannie Mae and Freddie Mac.

188. HSBC, BNY's successor, entered into agreements with federal government agencies and/or government sponsored enterprises to provide homeowners including Plaintiffs who were in default with loss mitigation options. Pursuant to the agreements, HSBC would be required to offer loss mitigation options, such as a HAMP loan modification, to homeowners including Plaintiffs to lower their monthly mortgage payments to 38% of their monthly income. Then, the federal government agencies and/or government sponsored enterprises would lower the monthly mortgage payment by an additional 7% of the homeowner's monthly income.

Consequently, homeowners including Plaintiffs would pay only 31% of their monthly income while HSBC still would receive an amount equal to 38% of the homeowner's monthly income. Therefore, Plaintiffs were the **intended** third-party beneficiaries of HSBC's agreements with federal government agencies and/or government sponsored enterprises. See <u>Carlos S. Reyes v. Saxon Mortgage Services, Inc.</u>, 2009 WL 3738177, *2 (S.D. Cal.) (plaintiff's complaint alleging a third party beneficiary status with respect to a HAMP violation was **sufficient** to state a plausible claim for breach of contract under a third party beneficiary theory)

189. Under the terms of HSBC's agreements with federal government agencies and/or government sponsored enterprises and federal regulations, HSBC could not initiate foreclosure action without giving Plaintiffs adequate notice of a default such as the NOI, informing Plaintiffs of the action required to cure the default, and informing Plaintiffs of available loss mitigation options to cure the default, such as a HAMP mortgage loan modification.

190. Wells Fargo, HSBC's servicer, breached its agreements with federal government agencies and/or government sponsored enterprises and violated federal regulations by informing the third-party beneficiaries, Plaintiffs, that they were ineligible for the six (6) HAMP mortgage loan modifications even though they were eligible for the mortgage loan modifications and by failing to inform Plaintiffs of the action required to cure the default.

191. A mortgage loan modification would have reduced Plaintiffs' monthly mortgage payments to 31% of their monthly income, thus reducing their financial hardship.

192. As a result of HSBC and Wells Fargo's breach of contract, Plaintiffs were unable to modify their mortgage loan which caused them to experience damages in loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, foreclosure action, and loss of time and money spent in an effort to defend the foreclosure.

193. As third-party beneficiaries, Plaintiffs are entitled to damages as a result of HSBC and Wells Fargo's breach of contract described herein, including actual, compensatory, statutory, and punitive damages.

## COUNT 2
## NEGLIGENCE

194. Plaintiffs repeat and adopt all prior paragraphs of this pleading

195. To prove negligence, Plaintiffs need to show the existence of a duty, a breach of that duty, damages, and that the breaches of duty caused the damages. See, e.g., Lowman v. Wilbur, 309 P.3d 387, 389 (Wash. 2013). "The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff." Taylor v. Stevens City., 759 P.2d 447, 449 (Wash. 1988).

196. Wells Fargo did owe Plaintiffs a duty of care in handling Plaintiffs' loan modifications once it undertook to consider that request. Alvarez v. BAC Home Loans Servicing. L.P., 228 Cal. App. 4th 941 (2014). The court in Alvarez held that, once it accepts a loan modification application for consideration, a financial institution has a duty of care to the applicant since it is "entirely foreseeable that failing to timely and carefully process the loan modification applications could result in significant harm to the [applicant]." Alvarez, 228 Cal. *9 App. 4th at 948. Federal courts considering claims of negligence in the handling of loan modification applications have followed Alvarez. See, Johnson v. PNC Mortgage, 2015 WL 662261, at *4 (N.D. Cal. Feb. 12, 2015) ("Once PNC offered the Johnsons an opportunity to modify their loan, it owed them a duty to handle their application with ordinary care."); Gilmore v. Wells Fargo Bank, N.A., 75 F. Supp. 3d 1255, 1268 (N.D. Cal. 2014) (allegation that Wells Fargo failed to process completed application, gave borrower inaccurate information and attempted to foreclose while application was pending were sufficient to allege that Wells Fargo breached a duty owed to borrower by failing to process his loan modification with reasonable care).

197. Plaintiffs were not entitled to modification, but **once** Wells Fargo provided Plaintiffs with the loan modification application and asked them to submit supporting documentation, it owed them a duty to process the completed application once it was submitted. Hild v. Bank of America, N.A., 2015 WL 401316, at *6 (C.D. Cal. Jan. 29, 2015); Medrano v. Caliber Homes Loans, Inc., 2014 WL 72369256, at *11 (C.D. Cal. Dec. 19, 2014).

198. Plaintiffs were homeowners who entered into security instruments with BNY in the form of mortgage and promissory note on February 22, 2007. Thus, Plaintiffs' security instruments were guaranteed, securitized, or owned by a federal government agency such as the Federal Housing Administration or a government sponsored enterprise such as Fannie Mae and Freddie Mac.

199. Under the terms of Plaintiffs' security instruments and federal regulations, HSBC, BNY's successor, had a duty not to initiate foreclosure action without giving adequate notice of a default such as the NOI, informing Plaintiffs of the action required to cure the default, and informing Plaintiffs of available loss mitigation options to cure the default, such as a HAMP loan modification.

200. HSBC knew that it must serve the NOI to Plaintiffs at least 30 days in advance prior to commencing the foreclosure action, thus providing Plaintiffs with clear notice that quick action is necessary to prevent the action. HSBC knew that the requirement was significant and could not be disregarded. Therefore, HSBC owed a duty of reasonable diligence and care to Plaintiffs in handling the NOI.

201. HSBC breached its duty of reasonable diligence and care to Plaintiffs by failing to give them the notice and inform them of available loss mitigation options to cure the default. As a result of the breach, Plaintiffs were not able to (a) cure the default; (b) dispute the validity of the debt; (c) request the name and addresses of all the previous and current creditors; and (d) timely exercise their right to receive the benefit of the available loan modification options prior to facing the foreclosure action. Consequently, Plaintiffs failed to take quick action to prevent the foreclosure action and faced it without any knowledge.

202. In December 2017, Wells Fargo made an offer to Plaintiffs for a HAMP loan modification and provided them with an application. The loan modification required Plaintiffs to make a certain amount of income to be qualified. Plaintiffs' incomes were over $200,000, which was more than enough to be qualified for their expected monthly payment of about $4,500.

203. Plaintiffs accepted the offer contingent on verification of their income and signed the application and returned it along with their federal tax returns and bank statements to Wells Fargo. Thereafter, Plaintiffs submitted a total of six (6) loan modifications.

204. Plaintiffs took all required steps to receive the loan modification including sending all relevant documents to be qualified for the modification. At all relevant times, Plaintiffs' representations as required by the HAMP loan modification remained true in all material respects.

205. As a loan servicer, Wells Fargo had superior knowledge of the loan modification process and eligibility requirements and had a responsibility for determining the loan modification eligibility. Wells Fargo knew that its determination of Plaintiffs' loan modification eligibility would affect whether Plaintiffs could modify their mortgage loans. Wells Fargo knew that an incorrect determination of Plaintiffs' HAMP loan modification eligibility would cause Plaintiffs to experience financial hardship. Therefore, Wells Fargo owed a duty to Plaintiffs to exercise reasonable diligence and care in determining the loan modification eligibility.

206. Wells Fargo breached its duty of reasonable diligence and care in determining Plaintiffs' six (6) loan modifications eligibility by virtue of operating as a national bank subject to federal law, **entering** into security instruments with Plaintiffs, and entering into agreements with federal government agencies and/or government sponsored enterprises to offer mortgage loan modification to Plaintiffs.

207. Wells Fargo breached its duty to Plaintiffs by failing to exercise reasonable diligence and care in calculating NPV, auditing the mortgage loan modification calculation software, and informing plaintiffs that they were ineligible for the mortgage loan modifications even though they were eligible for the HAMP mortgage loan modifications.

208. Wells Fargo breached its duty to Plaintiffs by failing to timely review the applications and by relying on the fraudulent appraisal value.

209. When Wells Fargo discovered that its mortgage loan modification calculation software

was faulty and that previous NPV calculations were incorrect, Wells Fargo **knew** that Plaintiffs were erroneously denied mortgage loan modifications. Wells Fargo **knew** that the erroneous denials caused Plaintiffs to experience financial hardship. Therefore, Wells Fargo owed a duty to Plaintiffs to exercise reasonable diligence and care in **informing** Plaintiffs of their mortgage loan modification eligibility and mitigating any resulting financial hardship.

210. Wells Fargo breached its duty to Plaintiffs by failing to promptly inform Plaintiffs that they were eligible for mortgage loan modifications after discovering that they were erroneously denied the loan modifications and failed to mitigate any resulting financial hardship from the erroneous denial.

211. A mortgage loan modification would have reduced Plaintiff's monthly mortgage payments to 31% of their monthly income, thus reducing their financial hardship and also terminating the foreclosure action.

212. As a result of Wells Fargo's negligence, Plaintiffs were unable to modify their mortgage loans and were unaware that they were erroneously denied mortgage loan modifications which caused them to experience damages in the form of loss of equity in their house, damaged credit, accumulated arrears on their mortgage, loss of tax benefits, and foreclosure action.

213. HSBC hired Phelan to proceed the foreclosure action against Plaintiffs in New Jersey court. Phelan knew his business practice should abide by the New Jersey Rules of Court, New Jersey Rules of Professional Conduct and Attorney Ethics. Therefore, Phelan owed a duty to Plaintiffs to exercise reasonable diligence and care in practicing his business in New Jersey court.

214. Phelan breached its duty by failing to exercise reasonable diligence and care in serving the complaint, the motions and the orders. The harm caused by a breach of Phelan's duty was readily foreseeable and flowed directly from the breach.

215. Phelan breached its duty by failing to exercise reasonable diligence and care in repeatedly making false statements regarding the services even though he knew he did not

serve the documents on parties of interest.

216. As a result of Phelan's negligence, Plaintiffs could not effectively defend the foreclosure action and had to spend time and money in an effort to defend the action over five (5) years. HSBC thus is liable for negligence of the counsel.

217. Wells Fargo hired the appraiser to conduct a standard appraisal report as part of Plaintiff's loss mitigation. The appraiser knew the report should be prepared based upon the Uniform Standards of Professional Appraisal Practice. The appraiser thus owed a duty to Plaintiffs to act with reasonable diligence and care in preparing the report based upon the Practice.

218. The appraiser breached its duty of reasonable diligence and care to Plaintiffs by falsely deflating the value of the appraisal in order to assure that Plaintiffs would not qualify for the loss mitigation. As a result of the appraiser's negligence, Plaintiffs were not approved for the loss mitigation which they should have been qualified for. The harm caused by a breach of the appraiser's duty was readily foreseeable and flowed directly from the breach.

219. Consequently, Plaintiffs were unable to modify their mortgage loan which caused them to experience damages in the form of loss of equity in their house, damaged credit, and time and money spent in an effort to defend the action over five (5) years. Wells Fargo is liable for the negligence of the appraiser.

### COUNT 3
### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692, et seq.

220. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

221. The Fair Debt Collection Practices Act ("FDCPA") prohibits debt collectors from making false or misleading representations and from engaging in various and unfair practices. The Act says that a debt collector may not falsely represent the character, amount, or legal status of any debt, 15 U.S.C. § 1692e(2)(A) and may not use various unfair or unconscionable means to collect or attempt to collect a consumer debt, 15 U.S.C. § 1692f.

31

222. Plaintiffs are defined as consumers under 15 U.S.C. § 1692a(3). HSBC is defined as a creditor under 15 U.S.C. § 1692a(4). Wells Fargo is defined as a debt collector under 15 U.S.C. § 1692a(6). Plaintiffs' mortgage is a debt, as defined by 15 U.S.C. § 1692a(5).

223. In violation of 15 U.S.C. § 1692f, Wells Fargo engaged in unfair or unconscionable means to collect a debt including incorrectly calculating attorney fees associated with Plaintiffs' six (6) HAMP loan modifications and improperly rejecting the loan modifications.

224. Plaintiffs should have received the HAMP modification, but Wells Fargo used an unconscionable method to deny Plaintiffs' loan modifications, eventually resulting in unnecessary foreclosure action in New Jersey court.

225. By representing that Plaintiffs were not eligible for the HAMP modifications to their mortgage, a statement which Wells Fargo now admits was false, Wells Fargo used a deceptive, false and misleading representation in connection with the collection of a debt, which is in violation of 15 U.S.C. § 1692e, False or misleading representation.

226. Plaintiffs were not served on the Notice which is required by the FDCPA. Under 15 U.S.C. § 1692, et seq, lenders must provide the borrower with notice of their attempts to secure repayment through litigation. At no time did Plaintiffs receive such notification from Wells Fargo.

227. The FDCPA allowed the borrower to dispute the validity of the debt and request the name and addresses of all the previous and current creditors. If the borrower chooses in writing to dispute the debt and to request the names and addresses of the creditors, the FDCPA requires the lender to suspend its efforts until the lender mails the borrower the information validating the debt and names and addresses of the previous and current creditors. Wells Fargo nevertheless failed to do so, thus violating the Act.

228. Wells Fargo's appraiser fraudulently falsified data in order to deflate the appraisal value. By falsely deflating the appraisal value, Wells Fargo deceitfully ensured that Plaintiffs would not qualify for the HAMP loan modifications which they should have qualified for. Wells Fargo conduct was in violation of 15 U.S.C. § 1692e, False or misleading representation. "The

basic purpose of the FDCPA:... to protect all consumers, the gullible as well as the shrewd, the trusting as well as the suspicious, from abusive debt collection practices." Brown, 464 F.3d at 454.

229. Wells Fargo provided Shim with an illusory verbal TRP that caused an automatic lapse in her on time payments, thus deceptively driving Shim into default, which was in violation of 15 U.S.C. § 1692e, False or misleading representation. Shim thus has never defaulted.

230. The United States Supreme Court settled the split decisions between the Federal Circuit Courts by Ruling in favor of the Seventh Circuit Court of Appeals, holding that the FDCPA did cover attorneys filing civil litigation to collect a debt and that attorneys needed to **comply with** the FDCPA. See Heintz v. Jenkins, 514 U.S. 291 (1995) No. 94-367. The Ruling has since been the law of the land with respect to the Act and applies here to this action as well.

231. A lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly attempts to collect those consumer debts. See, e.g., Black's Law Dictionary 263 (6th ed. 1990) ("To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or **legal proceedings**").

232. Accordingly, HSBC's counsel, Phelan, was covered under the Act in collecting the debt through the foreclosure action in New Jersey court. The acts of Phelan prohibited by the Act include but are not limited to the following:

a. Phelan failed to serve the Notice required by the FDCPA on Shim and Mo.

b. Phelan repeatedly made false statements regarding the complaint, the motions and
45
the orders even though he **knew** he did not serve the documents on parties of interest. As such, his conduct constitutes false representations to collect or attempt to collect a consumer debt, 15 U.S.C. § 1692f.

c. Phelan knowingly and willfully submitted the fraudulent USPS certified mail receipt since the tracking number still indicates that its label was created, but yet in the system as of July 17, 2021. Phelan realized that it failed to serve the Complaint on the U.S.A. - DC at that juncture and thus intentionally submitted the fraudulent receipt after seventeen (17) months from the day it claimed to serve.

33

    d. Phelan knowingly and willfully submitted the deficient Notice of Intention to Foreclose dated January 16, 2015 to cover up its non-compliance. Phelan submitted the same document on August 24,  2017, but intentionally **deleted** the tracking number to cover up its non-compliance.

233. Phelan was recently put on **Notice** by the U.S. District Judge Timothy J. Savage due to the firm's violations of the FDCPA. See Collins v. Phelan Hallinan Diamond & Jones, LLP. Civil Action No. 17-3727 (E.D. Pa. March 1, 2018). In September 2016, Phelan settled a civil action against the firm due to the violations of the FDCPA. See Wong v. Phelan Hallinan & Diamond, PC., 2:14-cv-03252 (ES) (D.N.J. June 25, 2015). See also, Kimmel v. Phelan Hallinan & Schmieg, PC., Civil Action No. 11-2596, 847 F. Supp. 2d 753 (E.D. Pa 2012), McLaughlin v. Phelan Hallinan & Schmieg, LLP., Nos 13-2015, 13-3679, 13-3712. 756 F.3d 240 (3rd Cir. 2014), Kraft v. Phelan Hallinan Diamond & Jones, P.C., 3:17-cv-13765-BRM-DEA (D.N.J. July 30, 2019). Those were the lawsuits directly related to the firm's violations of the Act.

234. The Court must consider in reviewing the Plaintiffs' claims for violation of the FDCPA, that such claims are viewed objectively from the perspective of the **least** sophisticated consumer. Kaymark v. Bank of America, N.A., 783 F.3d 168, 174 (3d Cir. 2015). Using this standard, the Court is directed to inquire whether the allegedly false or misleading statement "has the potential to affect the decision making process of the least sophisticated debtor; in other words, it must be material when viewed through the least sophisticated debtor's eyes." Jensen v. Pressler & Pressler, 791 F.3d 413, 421 (3d Cir. 2015)

235. Furthermore, the "FDCPA is a strict liability statute to the extent it imposes liability without proof of an intentional violation." Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 368 (3d Cir. 2011) The statute creates a **private right** of action against debt collectors who fail to comply with its provisions. 15 U.S.C. § 1692k; Marx, 133 S.Ct. at 1171 n. 1 ; Brown v. Card Serv. Ctr., 464 F. 3d 450, 453 (3rd Cir. 2006).

236. Wells Fargo and HSBC are severally liable to Plaintiffs for actual damages pursuant to 15.U.S.C. § 1692k(a)(1), statutory damages in the amount of $1,000 pursuant to 15 U.S.C. §

1692k(a)(2)(A), and reasonable costs pursuant to 15 U.S.C. § 1692k(a)(3). In addition, Plaintiff suffered damages in accumulated arrears on their mortgage and the foreclosure action.

### COUNT 4
### VIOLATION OF THE TRUTH IN LENDING ACT, 16 U.S.C. 1601, et seq.

237. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

238. The Truth in Lending Act (TILA), 15 U.S.C. 1601 et seq., was enacted on May 29, 1968, as title I of the Consumer Credit Protection Act (Pub. L. 90-321). The TILA, implemented by Regulation Z (12 C.F.R. 1026), became effective July 1, 1969.

239. Plaintiffs are  consumers under 15 U.S.C. § 1602(i).

240. HSBC and Wells Fargo are creditors under 15 U.S.C. § 1602(g)

241. The TILA, which is to be liberally construed in the consumer's favor, Inge v. Rock Fin. Corp., 281 F.3d 613, 621 (6th Cir. 2002), is a federal law to help protect consumers in their dealings with lenders and creditors.

242. TILA recognizes mortgage modification plans as a solution for homeowners facing a default, financial hardship, or foreclosure. It defines a qualified loss mitigation plan to include a residential loan modification, workout, or other loss mitigation plan, as requested by Plaintiffs to HSBC. 15 U.S.C. § 1639a(f)(1)(A).

243. Pursuant to 15 U.S.C. § 1639a(a)(2)(C), the servicer reasonably determined that the modification of such a qualified loss mitigation plan to a mortgage will likely provide an anticipated recovery on the outstanding principal mortgage debt that will exceed the anticipated recovery through foreclosures.

244. Wells Fargo, HSBC's servicer, did not perform its duty under TILA. Wells Fargo did not reasonably determine that Plaintiffs' HAMP loan modification would not provide the anticipated recovery of the outstanding principal mortgage debt. Wells Fargo even admitted that if it had properly evaluated the Plaintiffs' modifications, Plaintiffs would have qualified under the terms set forth in TILA.

35

245. Wells Fargo provided Shim with an illusory verbal TRP that caused an automatic lapse in Shim's on time payments, thus driving her into default, which is in violation of 15. U.S.C. § 1692e, false or misleading representation.

246. Wells Fargo's misapplication of Shim's mortgage payments to an unknown "suspense" account as well as a fee of $800 for the verbal TRP without a factual basis and a notice were deceptive business conducts, which was in violation of 15. U.S.C. § 1692e.

247. Wells Fargo's appraiser intentionally and fraudulently falsified data regarding several properties allegedly "comparable" to Plaintiffs' in order to deflate the appraisal value to $820000. By falsely deflating the appraisal value, Wells Fargo illegally and deceitfully ensured that Plaintiffs would not qualify for the six (6) HAMP loan modifications which they should have qualified for. As such, Wells Fargo's conduct was in violation of 15. U.S.C. § 1692e.

248. Pursuant to 15 U.S.C. § 1641(g), the new owner or assignee of a mortgage loan must notify the borrower in writing within 30 days after the mortgage loan is sold or otherwise transferred. This notification must include the following: (a) the identity, address, telephone number of the new creditor; (b) the date of transfer; (c) how to reach an agent or party having authority to act on behalf of the new creditor; (d) the location of the place where transfer of ownership of the debt is recorded; and (e) any other relevant information regarding the new creditor.

249. Plaintiffs nevertheless did not receive the Notice from either HSBC or Wells Fargo, as well as Everbank. At no time did Plaintiffs receive such notification from them.

250. An Assignee that violates this notice requirement is subject to civil penalties under Section 130(a) of TILA. The maximum penalty is $4,000 that an **individual** consumer may recover for each TILA violation in connection with a closed-end loan secured by real property or a dwelling. For willful or knowing violations, a person may be fined up to $5,000 and/or imprisoned up to one year, in accordance with Section 112 of TILA.

251. The equitable tolling doctrine should apply for Plaintiff's claims since HSBC and Wells

36

Fargo deceptively concealed its violations. In <u>Ramadan v. Chase Manhattan Corp.</u>, 156 F.3d 499, 502 (3d Cir. 1998), the court stated that the equitable tolling doctrine applies to § 1640(e) and found that "allowing lenders to violate TILA, but avoid liability if they successfully concealed the violation from the debtor for a year, would **undermine** the core remedial purpose of TILA."

252. The equitable tolling doctrine can **suspend** the one year statute of limitations period until the borrower discovers or has reasonable opportunity to discover the fraud or nondisclosures. <u>Jones v. TransOhio Sav. Ass'n.</u>, 747 F.2d 1037, 1041 (6th Cir. 1984).

253. To satisfy the standard of equitable tolling in the fraudulent concealment context, a plaintiff must establish that: " '(a) the defendant took affirmative steps to conceal the plaintiff's cause of action: and (b) the plaintiff could not have discovered the cause of action despite exercising due diligence.' " <u>Matthews v. New Century Mortgage Corp.</u>, 185 F. Supp. 2d 874, 883 (S.D. Ohio 2002) (quoting <u>Jarrett v. Kassel</u>, 972 F.2d 1415, 1423 (6th Cir. 1992)); See also <u>Mills v. Equicredit Corp.</u>, 294 F. Supp. 2d 903, 908 (E.D. Mich. 2003). Accordingly, this Court should apply the doctrine since Plaintiffs discovered the TILA violations at the time of the filing of this action due to Defendants' concealing them and Plaintiffs' inability to discover them despite exercising due diligence.

254. On December 6, 2018, the US Court of Appeals for the Ninth Circuit held in **<u>Hoang v. Bank of America. N.A.</u>** that in the absence of a specified statute of limitations period under the Truth in Lending Act (TILA) (15 U.S. C. § 1601 to 1693r) for loan rescission enforcement claims, the limitation period should be determined by applying the most analogous state law statute. In <u>Hoang</u>, the court found that the six-year limit under Washington's general contract law applies, **rather than TILA's one-year** limitation for legal damages claims (910 F. 3d 1096 (9th Cir. 2018)).

255. As a result of HSBC and Wells Fargo's violation of TILA, Plaintiffs were unable to modify their mortgage loan which caused them to experience damages in the form of loss of equity in their house, accumulated arrears on their mortgage, and foreclosure action.

**COUNT 5**
**VIOLATION OF N.J.S.A. 17:29B-4, UNFAIR METHODS OF COMPETITION, UNFAIR, DECEPTIVE ACTS & PRACTICES**

256. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

257. "The doctrine of unfair competition traditionally has been interpreted by courts in accordance with common law principles. Understandably, because the common law of unfair competition has evolved unevenly over the years, judicial applications in this tort field have not always been uniform or fixed." Columbia Broadcasting System, Inc. v. Melody Recording, Inc., 134 N.J. Super. 368, 375-376 (App.Div. 1975) (citing Squeezit Corp. v. Plastic Dispensers, 31 N.J. Super. 217, 221 (App. Div.1954); Ellis, Trade Secrets § 9 (1953)). "The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently **flexible** to accommodate those goals." Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001). The gist of an action for unfair competition is "fair play". See Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super. 87 (App. Div. 2001).

258. Pursuant to N.J.S.A. 17 § 29B-4, the statute prohibits unfair methods of competition, which includes any unfair or deceptive business practice.

259. A business practice is unfair when it offends an established public policy or when the practice is deceptive, unscrupulous, or injurious to consumers.

260. Wells Fargo and HSBC conducted business practice that are deceptive, unscrupulous, and injurious to Plaintiffs by:

a. Wells Fargo and HSBC made methodical, intentional false representations which it knew would cause and result in financial damages to Plaintiffs.

b. Wells Fargo knowingly and willfully did not process Shim's May mortgage payment in 2014. Wells Fargo then offered the verbal TRP to Shim without ever intending to modify her mortgage loan. Wells Fargo thus made a false representation of the fact to Shim. Wells Fargo knew it was a false offer.

c. Wells Fargo then unilaterally instructed Shim to send her payments in a confusing and varying manner, thus driving her into default.

d. Wells Fargo processed the received payments on different dates and deliberately delayed notices to Shim so that Shim was late in her payments. Wells Fargo thus deceived Shim.

e. Wells Fargo returned $2,410.95 back to Shim and then suddenly **stopped** accepting payments from her, thus causing default.

f. Wells Fargo unilaterally instructed Shim to send her payments in a confusing and varying manner without ever intending to modify her loan. HSBC thus deceived her and its behavior was deceptive and misleading.

g. Wells Fargo's creation of back dated documents in the guise of having legitimate business records are illegitimate and fraudulent business practices. Shim never saw or received the verbal TRP approval document dated on February 17, 2015 that Wells Fargo produced. In fact, the verbal TRP was performed in 2014 not 2015. Wells Fargo thus produced the fraudulent document and made a material misrepresentation to Shim.

h. The fee of $800 for the verbal TRP was a violation of 12 C.F.R. § 1026.19(e)(2)(i)(A).

i. The verbal TRP was a way for Wells Fargo to unilaterally impose a new amount, misapply funds and tell Shim that she was no longer eligible to pay the agreed amount of the loan because she was "late".

j. Wells Fargo provided Shim with an illusory verbal TRP that caused an automatic lapse in her on time payments and Wells Fargo's misapplication of her mortgage payments to an unknown "suspense" account was a deceptive business conduct.

k. Shim justifiably relied upon Wells Fargo's false representation and was induced by it.

l. As a result of Shim's reliance upon Well Fargo's false representation, Shim was driven into default and eventually faced foreclosure action in New Jersey court. Wells Fargo thus made false representations to Shim and its conduct was unfair and deceptive.

m. As a result of the default, Shim sustained damages, which include: foreclosure action, loss of equity on her house, accumulated arrears on her mortgage, loss of tax benefit, and damaged credit.

n. In 2018, Wells Fargo offered HAMP loan modification to Plaintiffs without ever **intending** to modify their mortgage loan. Wells Fargo thus made a misleading representation to Plaintiffs. Wells Fargo knew it was a misleading offer.

o. Wells Fargo then instructed Plaintiffs to send documents for the modification without ever intending to modify their loan. Wells Fargo thus deceived Plaintiffs and its conduct was deceptive.

p.  The appraiser intentionally and fraudulently falsified data regarding several properties allegedly "comparable" to Plaintiffs' in order to deflate the appraisal value to $820,000. By falsely deflating the appraisal value, Wells Fargo illegally and deceitfully ensured that Plaintiffs would not qualify for the six (6) HAMP loan modifications which they should have qualified for.

q.  Plaintiffs thus sent a letter to Wells Fargo addressing the issue over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Plaintiffs their HAMP loan modifications based upon the falsified appraisal report.

r.  Wells Fargo's falsifications of the appraisal report and resultant disapproval of Plaintiffs' HAMP loan modifications constitute unfair and deceptive business conduct.

s.  Wells Fargo's faulty HAMP calculation software and negligent lack of oversight failed to consider Plaintiffs' loss mitigation, and consequently denied Plaintiffs their HAMP loan modifications despite being qualified for the modifications.

t.  Wells Fargo unconscionably and deceptively denied Plaintiffs their HAMP loan modifications even though they met all objective requirements to receive the modification.

u.  Wells Fargo's deceptive practice with regard to HAMP loan modification include:

(a)  Creating and using an internal software that were defective, thus incorrectly calculated Plaintiffs' qualification;

(b)  Failing to properly supervise its loss mitigation personnel and technical employee who  developed and used the faulty internal software to determine Plaintiffs' qualification for HAMP loan modification;

(c)  Making inaccurate calculation and determination of Plaintiffs' eligibility due to the faulty software, thus failing to qualify Plaintiffs for their loan modifications;

(d)  Not conducting adequate testing its internal software;

(e)  Failing to inform Plaintiffs that they were eligible for the loan modifications after discovering that they were erroneously denied;

(f)  Concealing the faulty internal software error from 2015 through 2018.

v.  Wells Fargo's omissions and representations were material since they were likely to deceive Plaintiffs about their entitlement to a HAMP loan modification and the adequacy of Wells Fargo's method for evaluating Plaintiffs' entitlement to a HAMP modification.

w.  Wells Fargo misled Plaintiffs and induced them to rely on its omissions and misrepresentations.

x.  As a result of Plaintiffs' reliance upon Wells Fargo's false representations, Plaintiffs could not modify their mortgage loan and were not able to stop the foreclosure action. Plaintiffs thus sustained damages, which include: accumulated arrears on their mortgage, loss of tax benefit, and loss of time and money spent in an effort to defend the action

y.  Wells Fargo's methodical scheme of dishonest representations to Plaintiffs concerning the receipt of their HAMP loan modification documents was a "deceptive' act within the meaning of the Act as the misrepresentations were deliberate acts to mislead and did **in fact mislead** Plaintiffs.

z.  Wells Fargo's methodical scheme of dishonest representations to Plaintiffs concerning HAMP applications, the purpose of which was to **deceive the Federal Government** in order to increase the Bank's profits was deceptive commercial practice.

aa. Phelan repeatedly made false statements regarding the services even though he **knew** he did not serve the documents on parties of interest. As such, his conduct constitutes deceptive business practice under the Act.

bb. Phelan knowingly and willfully submitted the fraudulent USPS certified mail receipt since the tracking number still indicates that its label was created, but yet in the system as of July 17, 2021. Phelan realized that it failed to serve the Complaint on the U.S.A. - DC at that juncture and thus intentionally submitted the fraudulent receipt after seventeen (17) months from the day it claimed to serve.

cc. Phelan knowingly and willfully submitted the deficient Notice of Intention to Foreclose dated January 16, 2015 to cover up its non-compliance. Phelan submitted the same document on August 24, 2017, but intentionally **deleted** the tracking number to cover up its non-compliance.

dd. Phelan possessed a legal duty to act with reasonable prudence, caution, and care to avoid and ensure against causing or creating an unreasonable risk of or actual harm to any party in the action including Plaintiffs who were devastatingly affected by his action in connection with the complaint, the motions and the orders.

ee. Plaintiffs justifiably relied upon Phelan's false representations and was induced by it,

ff.  As a result of Plaintiffs' reliance upon Phelan's false representations, Plaintiffs had to spend time and money in an effort to defend the foreclosure action over five (5) years. Plaintiffs thus sustained damages, which include: loss of equity on their house, accumulated arrears on their mortgage, loss of tax benefit, attorney fees, and costs of the action.

gg. HSBC commenced a foreclosure action seeking to take Plaintiffs' home. The filing of the foreclosure was **only possible** after Shim was driven to default on the loan under the verbal TRP.

hh. The acts of Defendants complained of herein possess the tendency or capacity to mislead, or create the likelihood of deception.

ii.  The acts of Defendants complained of herein violate public policy, amount to an inequitable assertion of its power and position, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff and other consumers.

jj.  The acts of Defendants complained of herein intended to mislead Plaintiffs and induce them to rely on its omissions and false representations.

kk. The acts of Defendants complained of herein were committed knowingly and willfully

261. Wells Fargo's business practice offended established public policy that was bound to HAMP. The Department of the Treasury declared that HAMP was designed to help homeowners who struggled to keep their house due to financial hardship.

262. A business practice is unlawful when it is proscribed by other regulation or statute. By proscribing any unlawful business practice, N.J.S.A. 17:29B-4 allows injured consumers to borrow violations of other laws and treat them as unfair competition.

263. On February 18, 2009, President Obama announced the Homeowner Affordability and Stability Plan to help homeowners to refinance their mortgages to avoid foreclosure. On March 4, 2009, the Treasury issued uniform guidance for loan modifications across the mortgage industry. The Supplemental Directive 09-01 provides additional guidance to servicers for adoption and implementation of HAMP for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac. Under HAMP, a servicer will use a uniform loan modification process to provide a borrower with sustainable monthly payments.

264. Wells Fargo violated the requirements of HAMP, such as Supplemental Directive 09-01, if a borrower meets all qualifying criteria, the servicer must offer the modification.

265. As a loan servicer, Wells Fargo knew that Plaintiffs were erroneously denied even though they were qualified for HAMP loan modifications. Wells Fargo knew that the erroneous denials caused Plaintiffs to experience financial hardship. Uniformly telling Plaintiffs that they were not qualified for the HAMP loan modifications when they in fact were qualified constitutes a

deceptive practice under N.J.S.A, 17:29B-4 because it was likely to deceive Plaintiffs about their entitlement to their loan modifications.

266. Wells Fargo knew that its internal software was faulty and had caused hundreds of homeowners including Plaintiffs to be erroneously denied their mortgage loan modifications.

267. Even though Wells Fargo had knowledge of the faulty internal software and incorrect calculations, Wells Fargo continued to use the faulty software.

268. Wells Fargo's omissions and representations were material since they were likely to deceive Plaintiffs about their entitlement to a HAMP loan modification and the adequacy of Wells Fargo's method for evaluating Plaintiffs' entitlement to a HAMP modification.

269. Wells Fargo intended to mislead Plaintiffs and induce them to rely on its omissions and misrepresentations.

270. A mortgage loan modification would have reduced Plaintiffs' monthly mortgage payments to 31% of their monthly income, thus reducing their financial hardship.

271. As a result of Wells Fargo's violation of the Act, Plaintiffs were unable to modify their mortgage loan which caused them to experience damages in loss of equity in their house, damaged credit, accumulated arrears on their mortgage, and foreclosure action.

272. Plaintiffs are entitled to damages as a result of Wells Fargo's unfair and deceptive practices described herein, including actual, compensatory, statutory, and punitive damages.

### COUNT 6
### VIOLATION OF THE NEW JERSEY HOME OWNERSHIP SECURITY ACT OF 2002

273. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

274. The intent of the New Jersey Home Ownership Security Act is to "prohibit practices in the making of home mortgage loans." DaSilva v. Aries Fin., LLC, No. 08-19547, 2011 WL 235 8513, at *4 (Bankr.D.N.J. June 9, 2011). The act designates three types of loans - home loans, covered home loans, and high cost home loans - and "subjects creditors who issue them ...to increasing levels of regulation." Id. (citing Baher Azmy & David Reiss, Modeling a Response to Predatory Lending: The New Jersey Home Ownership Security Act of 2002, 35 RUTGERS L.J.

645, 671 (2004))

275. Pursuant to N.J.A.C. § 3:5-1.3, (a) Plaintiff is a borrower; (b) Plaintiff's mortgage loan is a consumer credit; and (c) Wells Fargo is a creditor.

276. New Jersey's anti-predatory lending law, officially known as the "New Jersey Home Ownership Security Act of 2002." c. 64, P.L. 2003 (the "NJ Act") places restrictions on "home loans", "covered home loans" and "high-cost home loans." The remedies and penalties provided for in the NJ Act are as follows:

    a. Section 8(a) says that violations of any of the provisions of the NJ Act are also violations of the New Jersey Consumer Fraud Act which allows for recovery of treble damages, attorney's fees and court costs.

    b. Section 8(b) provides that, as an alternative to the CFA remedies, borrowers can recover statutory damages for "material   violations" equal to the amount of all finance charges plus 10 percent of the amount financed. For malicious or reckless violations, the borrower can also recover punitive damages plus attorney fees and court costs.

    c. Violation of the NJ Act can also lead the New Jersey Department of Banking and Insurance to impose: (i) fines up to $10,000 per violation; (ii) license suspensions or revocations; (iii) cease and desist order; and (iv) in extraordinary situations, emergency restraints.

277. The NJ Act impacts all home loans, not just non-prime loans. The NJ Act prohibits, as to all home loans;

    a. Acceleration: accelerating the indebtedness at the creditor's sole discretion.

    b. Encouraging Defaults.

    c. Where the creditor does not send the borrower written notification of the imposition of the late fee within 45 days.

    d. Posting of Payments: posting a payment other than on the same date that it was received.

278. Wells Fargo's violations of the NJ Act are as follows:

    a. Wells Fargo accelerated Plaintiffs' mortgage at its sole discretion because Wells Fargo unilaterally terminated the loan modification agreement dated March 12, 2012, thus knowingly and willfully drove Plaintiff into foreclosure and accelerated Plaintiffs' mortgage.

b. Wells Fargo provided Plaintiffs with an illusory verbal TRP that caused an automatic lapse in Plaintiffs' on time payments, thus knowingly and willfully encouraged default. Wells Fargo stopped accepting Plaintiffs' payments without a factual basis or a notice, thus encouraging default.

c. Wells Fargo unilaterally instructed Plaintiffs to send their payments in a confusing and varying manner without any late payment fees or provisions, thus failing to send Plaintiffs written notification of the imposition of the late fee.

d. Wells Fargo's verbal TRP was a way for Wells Fargo to unilaterally impose new amounts, misapply funds and post Plaintiffs' on time payment other than on the same date it was received. **See Exhibit D**.

279. Section 6(b) of the NJ Act makes purchasers or assignees of home loans to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original creditor. Furthermore, Section 6(c) enables a borrower acting only in an individual capacity to assert against any creditor or any subsequent holder or assignee any defense, claim or counterclaim based on a violation of the NJ Act.

280. As a result of Wells Fargo's violations of the Act, Plaintiffs faced the foreclosure action in New Jersey court, which caused them to experience damages in loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefit, damaged credit, and time and money spent in an effort to defend the foreclosure action over (4) years.

### COUNT 7
### FRAUDULENT APPRAISAL

281. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

282. The Uniform Standards of Professional Appraisal Practice ("USPAP") is the generally recognized ethical and performance standards for the appraisal profession in the United States. USPAP was adopted by Congress in 1989, and contains standards for all types of appraisal services, including business, residential and commercial appraisal. Compliance is required for state-licensed and state-certified appraisers.

283. Pursuant to 12 CFR § 323.4, for federally related transactions, all appraisals shall, at a minimum:

45

(a) Conform to generally accepted appraisal standards as evidenced by the USPAP, unless principles of safe and sound banking require compliance with stricter standards;

(b) Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction;

(c) Be subject to appropriate review for compliance with the USPAP;

(d) Analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units; and

(e) Be based upon the definition of market value as set forth in this subpart;

284. The appraiser, Rocco Clementi Jr., violated all of the above by generating the falsified appraisal report and by utilizing said appraisal to disqualify Plaintiffs for their loan modifications

285. Pursuant to N.J. Admin. Code § 13:40A-6.1, (a) The appraiser shall ensure that all appraisal shall, at a minimum conform to the USPAP in effect on the date on which the appraisal was prepared, which standards are incorporated herein by reference, (b) An appraiser's failure to comply with the provisions USPAP may be construed to be professional misconduct in violation of 45:1-21(e).

286. The appraiser possessed a legal duty to act with reasonable prudence, caution and care to avoid causing or creating an unreasonable risk of or actual harm to Plaintiffs who were devastatingly affected by his actions in connection with the appraisal report for Plaintiffs' loan modification. The appraiser breached this duty by generating the falsified appraisal report and by utilizing said appraisal to disqualify Plaintiffs for their loan modifications.

287. By the falsified appraisal report, Wells Fargo deceitfully ensured that Plaintiffs would not qualify for the loan modifications which they should have qualified for. Plaintiffs thus addressed the issue over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Plaintiffs their loss mitigations based upon the fraudulent appraisal report. **See Exhibit J, K & L.**

288. Pursuant to the Federal Deposit Insurance Act, 12 U.S.C. 1811 et seq., institutions and institution-affiliated parties, including staff appraisers and fee appraisers, may be subject to removal and/or prohibition orders, cease and desist orders, and the imposition of civil money penalties. Wells Fargo is liable for the appraiser's violations and thus is also liable for the civil money penalties.

289. As a result of Wells Fargo's fraudulent appraisal, Plaintiffs were unable to modify their mortgage loan which caused them to experience damages in loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, and loss of time and money spent in an effort to defend the foreclosure action over five (5) years.

## COUNT 8
## WRONGFUL FORECLOSURE ACTION IN NEW JERSEY COURT

290. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

291. In order for HSBC to have the right to foreclose, a debt must be owed to HSBC and HSBC must have a security interest in the property supported by the debt. HSBC must show (a) that HSBC holds the Note, and (b) that the mortgage was assigned to HSBC in writing. N.J.S.A. § 46:9-9. Assignment of the mortgage alone without transfer of the underlying obligation is **ineffective**. "Without the assignment of the debt, which is but evidence thereof, the assignment of the securities confers **no** rights." Johnson v. Clarke, 28 A. 558 (Ch. 1894).

292. It is axiomatic that the mortgage follows the Note. Thus, the principal thing that HSBC must demonstrate is that the debt obligation underlying the mortgage was owed to HSBC such that HSBC has a right to resort to the collateral securing the debt. Furthermore, since the secured obligation is the principal thing and the mortgage that secures it is only an incident which follows and attends the principal, an assignment of the Note evidencing the secured obligation operates as an assignment of the mortgage in equity. Federal Reserve Bank of Phila. v. Welch, 122 N.J. 90, 92 (Ch. 1937).

293. Furthermore, Shim's mortgage loan was securitized or pooled with other loans and sold as a package to HSBC Bank as Trustee for Wells Fargo in return for Asset-backed Certificates,

Series 2007-11. Then, a BNY-related entity which was either EverBank or Wells Fargo was to deliver and endorse the original mortgage note to HSBC. However, delivery and endorsement did **not** occur.

294. Subsequently, MERS, in an apparent effort to cure the failure to deliver and endorse the mortgage note, and as the nominee for BNY, assigned the mortgage note to HSBC  as Trustee for Wells Fargo. The original mortgage note however **never left** the possession of the BNY-related entity.

295. HSBC thus **never** had possession of the note because it was not delivered and endorsed and therefore HSBC was not a "holder" under the New Jersey UCC. Also preventing HSBC from becoming a "holder" was that there was not a proper endorsement on the note itself, or an allonge that was executed at the time that the proof of claim was filed. HSBC could not be deemed a "nonholder in possession " because it did not possess the note. Finally, HSBC was not a "non-holder not in possession" because it could not satisfy the requisites of lost, destroyed or stolen instruments or payment or acceptance of the instrument by mistake under N.J.S.A. 12A:3-309 and subsection d. of N.J.S.A. 12A:3-418, respectively.

296. Shim's loan modification agreement dated on March 12, 2012 indicated that Wells Fargo was the **owner** of the loan. In March 2016, HSBC filed the foreclosure complaint **without** transfer of the loan from Wells Fargo. Thereafter, HSBC's counsel specified that HSBC was not the owner of Shim's mortgage, thus a motion to **substitute** HSBC is required. **See Exhibit DD**. HSBC tries to replace the owner **back** to Wells Fargo, because HSBC simply has **never** possessed the note. Accordingly, HSBC simply was not the owner of Shim's mortgage at the time of commencing the foreclosure action in New Jersey court.

297. In order to assure that defendants in the foreclosure action would not oppose the complaint and the motions, Phelan knowingly and willfully did not serve the motions, the orders, the complaint on parties of interest. Accordingly, the complaint and summary judgment were **invalid** because Phelan knowingly and willfully did not serve the said documents on parties of interest.

298. Furthermore, Wells Fargo deceptively drove Shim into default and vaguely alleges that the loan was defaulted on April 1, 2015, but the payment records indicate **otherwise**. Shim thus has never defaulted and HSBC is liable for the wrongful foreclosure action in New Jersey court.

299. As a result of HSBC's wrongful foreclosure, Plaintiffs were faced with the foreclosure action which caused them to spend time and money in an effort to defend the action over five (5) years. Consequently, HSBC keeps receiving the benefit of accumulated arrears on Plaintiffs' mortgage and has significantly damaged them. HSBC in fact received over $300,000 for the accumulated arrears on Plaintiffs' mortgage loan. Plaintiffs spent more than $500,000 for the subject property including down payment of $400,000, but it was all gone due to the accumulated arrears and expenses.

### COUNT 9
### VIOLATION OF THE FAIR FORECLOSURE ACT

300. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

301. The Fair Foreclosure Act promulgates strict foreclosure guidelines that lenders must comply with as they attempt to resolve non-performing loans. In U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449 (2012), the Supreme Court emphasized the important function of the NOI as part of the foreclosure process, explaining that "[t]he [NOI] is a central component of the FFA, serving the important legislative objective of providing timely and clear notice to homeowners that immediate action is necessary to forestall foreclosure." Id. at 470.

302. The FFA specifically and explicitly prescribes that a residential mortgage lender **must** serve a NOI to file foreclosure proceedings "by registered or certified mail, return receipt requested." N.J.S.A. 2A:50-56(a)-(b) (emphasis added). When the Legislature included the language "return receipt requested" in the FFA, it did so carefully, opting to impose a requirement that goes beyond the rule of general application in civil cases that permits service by regular mail, and that creates a presumption that a notice was received if it was mailed to the correct address. See Hammond v. City of Paterson, 145 N.J. Super. 452, 456 (App. Div. 1976) (holding that the Legislature, in requiring "actual receipt" of notice in the Tort Claims Act when

certified mail is not used, "clearly did not mean to leave proof of actual receipt to a presumption."); See also Intile Realty Co., Inc. v. Raho, 259 N.J. Super. 438, 454 (Law. Div. 1992) (holding that "[n]o presumption of receipt will arise from mailing by ordinary mail where the statute prescribes registered mail.").

303. In Hammond, it was noted that, "[i]t is evident from the tenor of the Tort Claims Act that the Legislature considered the receipt of the notice of fundamental importance." 145 N.J. at 455. It was also observed that it is clear from case law "[t]hat statutory requirements for giving notice in a particular fashion must be strictly followed." Ibid. This principle, of course, applies not only to the Tort Claim Act, but to the FFA as well.

304. Indeed, the FFA provision governing the service of notice goes further by explicitly requiring not just certified mail, but certified mail return receipt requested. It bears noting that this is a special, enhanced requirement as the Legislature does not always prescribe that notices and pleadings be mailed with a return receipt request as a condition of satisfactory service. In Green v. East Orange, 21 N.J. Tax 324 (2004), for example, the Tax Court relied on the fact that N.J.S.A. 54:4-34 - a statute governing tax assessment matters - does not incorporate a return-receipt requirement, but rather only requires that a tax assessor's request for information be made by certified mail. Id. at 334.

> The court in Green explained the difference between a delivery receipt (which is maintained by the United States Postal Service ("USPS") and a return receipt (which is returned to the sender). "Return receipt service is not automatically part of certified mail service but rather is an optional service." 21 N.J. Tax at 334. This optional service provides a mailer with evidence of delivery. Ibid. (quoting 58 Domestic Mail Manual § S915.1.1 (2003)).

305. When the Legislature chooses to impose a requirement to use the return-receipt-request option for certified mail, as it did in the FFA, we must assume that the requirement is significant and cannot be disregarded. Moreover, financial institutions would have little difficulty complying with this requirement, or later proving that they had done so simply by retaining the USPS receipt indicating that this option had been purchased. That receipt would satisfy the service

requirements of the FFA even if it should turn out that the return is not signed by the addressee. This mailing option thus protects the interest of lenders as well as borrowers.

306. In <u>GE Capital Mortg. Services, Inc. v. Weisman</u>, 339 N.J. Super. 590 (Ch. Div. 2000), a case involving foreclosure pursuant to the FFA, the Chancery Division Judge addressed the borrower's challenge to the lender's policy of mailing NOIs solely by means of first class mail. The court concluded that the lender's inability to provide proof demonstrating service was a violation of the FFA. <u>Id.</u> at 592-594. The Chancery Division judge determined that the appropriate remedy was to order the lender to forward a new NOI by certified mail, return receipt requested, within ten days. <u>Id.</u> at 595. In <u>E.M.C. Mortg. Corp. v. Chaudhri</u>, 400 N.J. Super. 126, 137 (App.Div. 2008), it was **rejected** that approach, noting that "[w]e **disapprove** of the remedy employed in that case [<u>GE Capital Mortg. Services, Inc.</u>], and reinforce the statutory mandate that lenders send proper notice...." 400 N.J. Super. At 139. It was concluded that the proper remedy for the FFA violation in <u>Chaudhri</u>, was **dismissal** of the foreclosure complaint, without prejudice, explaining that, "[w]e concur with the trial judge's dismissal, without prejudice, of [a lender's] foreclosure complaint due to the failure to send the notice of intent to foreclose prior to commencing suit.

307. As it was noted, the notice provisions are mandatory." It was further emphasized that, "[t]he Legislature specifically intended that lenders faithfully comply with the  FFA provisions.... Accordingly, courts are not free to deviate from the unambiguous statute."

> The FFA violation in <u>GE Capital Mortg. Services, Inc.</u>, was the use of regular mail rather than certified or registered mail. The court in that case did not have occasion to address the use of certified mail without a return receipt request.

Two important legal principles can be derived from these precedents. First, the explicit procedural provisions of the FFA are to be enforced **strictly**; partial compliance (e.g. using certified mail without the return-receipt-requested option) is not sufficient. Second, the remedy for a lender's noncompliance is **dismissal** of the foreclosure complaint, without prejudice.

308. Dismissal without prejudice is required for other reasons. The Act entitles a residential

borrower to service of a conforming notice of intention before acceleration of a mortgage obligation and before commencement of foreclosure proceedings. N.J.S.A. 2A:50-56(a). A cure within thirty days of receipt of proper notice may well affect the debtor's obligation to pay counsel fees and costs. See N.J.S.A. 2A:50-56(c)(7);  N.J.S.A. 2A:50-57(b)(3). Dismissal without prejudice ensures that defendants are not deprived of those non-waivable rights and that a plaintiff who has not fulfilled its duty under the Act will not **reap** a benefit from its noncompliance. Furthermore, the remedy of dismissal without prejudice is consistent with the statutory mandate that a plaintiff in a residential foreclosure action plead compliance with the notice of intention precondition in its complaint. N.J.S.A. 2A:50-56(f); accord R. 4:64-1(b)(13).

309. The New Jersey Supreme Court has expressly authorized trial courts to dismiss actions without prejudice for a loan servicer's failure to comply with the notice requirement of the FFA. See U.S. Bank Nat. Ass'n v. Guillaume, 209 N.J. at 476 ("A trial court adjudicating a foreclosure act may dismiss the action without prejudice."); see also EMC Mortgage v. Chaudhri, 400 N.J. Super. 126, 138-139 (App. Div. 2008); Bank of New York v. Laks, 422 N.J. Super. 201 (App. Div. 2011). In addition, the Court must be especially mindful of the deleterious "impact of the defect in the notice of intention upon the homeowner's information about the status of the loan, and on his or her opportunity to cure the default." Id., see also City National Bank v. Hodge, 2015 N.J. Super. Unpub LEXIS 835. *(App. Div. April 15, 2015) (dismissing default judgment with prejudice for failure to serve NOI).

310. In the end, the Legislature has imposed a duty that lenders must perform before they accelerate a residential mortgage obligation or commence an action to foreclose. In this case, HSBC did not fulfill its obligation before filing the action, and, regardless of the relative merits and equities, it is not entitled to accelerate the mortgage principal or maintain a foreclosure action until it complies.

311. Here, HSBC did not **even** try to send the NOI to Shim and Mo and its counsel repeatedly made false statements regarding the service of the NOIs and committed a forgery to cover up

its non-compliance. Furthermore, HSBC did not **even** prepare the NOI for Mo. HSBC thus failed to comply with express notice provisions of the FFA. Accordingly, the foreclosure complaint should have been **dismissed** when Shim filed the Motion to Dismiss and sur-reply in New Jersey court.  Unfortunately, the complaint is still active and keeps **damaging** Plaintiffs in the form of accumulated arrears on their mortgage.

312. As a result of HSBC's violation of the Act, Plaintiffs did not have a chance to cure the default, which caused them to experience damages in loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, and loss of time and money spent in an effort to defend the foreclosure action over five (5) years.

313. Plaintiffs are entitled to damages as a result of Wells Fargo's violations of the Act described herein, including actual, compensatory, statutory, punitive, and/or trebled damages.

### COUNT 10
### VIOLATION OF THE NEW JERSEY TRUTH-IN-CONSUMER CONTRACT WARRANTY AND NOTICE ACT

314. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

315. On October 4, 2018, the New Jersey Appellate Division issued a ruling that allows a homeowner to pursue a claim against Bank of America under the New Jersey Truth-in-Consumer Contract Warranty and Notice Act ("TCCWNA") due to the lender's violation of the Fair Foreclosure Act ("FFA"). Wright v. Bank of America, et al., (Docket No. A-2358-15T-3)

316. The New Jersey Appellate Court explained that in enacting TCCWNA, the legislature intended to create an expansive scheme for liability where there is a departure from any clearly established legal right or responsibility. The Court held that the FFA's requirements for NOIs is part of the foreclosure practice and thus a critical element that would fall within TCCWNA's scope.

317. TCCWNA, in short, prohibits the enforcement of contract provisions that violate "any clearly established legal right of a consumer ... as established by State or Federal law." The statute limits standing to "aggrieved consumer," but up until April 16, 2018, that term had not been defined.                      53

318. The New Jersey Supreme Court's ruling in <u>Spade v. Select Comfort Corp.</u>, 232 N.J. 504 (2018) explained that the term 'aggrieved consumer' denotes a consumer who has suffered some form of harm as a result of the defendant's conduct, and therefore held that, for the purposes of TCCWNA, "an 'aggrieved consumer' is a consumer who has been harmed by a violation of N.J.S.A. § 56:12-15." No.078611,2018 WL 1790394, at*11 (N.J. Apr.16, 2018).

319. The Court was quick to caution that harm does not necessarily require money damages, and that TCCWNA's statutory damages provision clearly contemplates actions by aggrieved consumers who did not necessarily suffer monetary damage. Id. The Court also held that New Jersey state regulations can form the basis of a TCCWNA action, as regulations have the force of law. Id. at *9.

320. The TCCWNA's legislative history speaks of holding all businesses liable for violations: "This bill prohibits businesses from offering or using provisions in consumer contracts, warranties, notices and signs that violate any clearly established right of a consumer." A - 1660, p. 3 (as introduced May 1, 1980)

321. HSBC is a creditor as defined by N.J.S.A. § 56:12-15.

322. Wells Fargo is a bailee as defined by N.J.S.A. § 56:12-15.

323. Pursuant to N.J.S.A. § 56:12-15, Plaintiffs are consumers.

324. The NOI is a written consumer notice subject to the TCCWNA pursuant to N.J.S.A. § 56:12-15

325. Accordingly, this failure to send the NOI to Plaintiffs is in clear violation of the FFA and **in turn**, the TCCWNA because such misrepresentation "violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." N.J.S.A. § 56:12-15.

326. As a result of HSBC's violations of the TCCWNA, Plaintiffs did not have a chance to cure the default, which caused them to experience damages in loss of equity in their house,

accumulated arrears on their mortgage, loss of tax benefits, damaged credit, loss of favorable interest rate due to the damaged credit, and loss of time and money spent in an effort to defend the foreclosure action over five (5) years.

327. Plaintiffs are entitled to damages as a result of HSBC's violation described herein, including statutory penalty of each TCCWNA violation, actual, compensatory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial.

## COUNT 11
## SERVICING VIOLATIONS

328. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

329. The requirements of the Rules with respect to service of process go to the jurisdiction of the court and must be **strictly** complied with "Berger v. Paterson Veterans Taxi Serv., 244 N.J. Super. 200, 204, 581 A.2d 1344 (App. Div. 1990) (quoting Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 493, 86 A.2d 201 (1952)). "substantial deviation from service of process rules' typically makes a **judgment void**." M & D Associates v. Mandara, 366 N.J. Super. 341, 353, 841 A.2d 441 (App. Div. 2004) (quoting Jameson v. Great Atl. and Pac. Tea Co., 363 N.J. Super. 419, 425, 833 A.2d 626 (App.div. 2003)).

330. In a foreclosure case, service can be obtained by satisfying the requirements of Rule 4:4-3 or Rule 4:4-5. Rule 4:4-3 applies where "personal service cannot be effected after a reasonable and good faith attempt, which shall be described with specificity in the proof of service required by R. 4:4-7". R. 4:4-3(a).  In that case, "service may be made by mailing a copy of the summons and complaint by registered or certified mail, return receipt requested, to the usual place of abode of the defendant or a person authorized by rule of law to accept service for the defendant." However, service by mail is effective only "if it appears by affidavit satisfying the requirements of Rule 4:4-5(b) that despite diligent effort and inquiry personal service cannot be made." R. 4:4-4(b)(1). Service made by mail without satisfying the affidavit requirement under Rule 4:4-4(b)(1) is ineffective and will **not** support the entry of default, **unless** the defendant "answers the complaint or otherwise appears in response thereto." R. 4:4-4(c). Thus, there must

be "a reasonable and good faith attempt" before serving the defendant by mail under Rule 4:4-3. See <u>U.S. Bank National Association v. Curcio</u>, 444 N.J. Super. 94, 106, 130 A. 3d 1269 (App. Div. 2016).

331. Phelan possessed a legal duty to act with reasonable prudence, caution, and care to avoid and ensure against causing or creating an unreasonable risk of or actual harm to any party in the foreclosure action including Shim and Mo who were devastatingly affected by his actions in connection with the motions, the orders and the complaint.

332. Pursuant to Rule. 1:6-3(c), service of motion papers is complete **only** on receipt at the office of adverse counsel or the address of a pro se party.

333. On September 11, 2017, Phelan filed the Motion to Reform the Loan Modification and attached the Certification of Mailing Service made to the Attorney General of the United States of America in Washington, D.C and a copy of the confirmation which claimed that service was completed on April 5, 2016.

334. Phelan in fact knowingly and willfully submitted a fraudulent USPS certified mail receipt since the tracking number still indicates that its label was created, but yet in the system as of July 17, 2021.

335. Phelan realized that it failed to serve the Complaint on the U.S.A. - DC at that juncture and thus intentionally submitted the fraudulent receipt after seventeen (17) months from the day it claimed to serve. The complaint thus was invalid because Phelan failed to serve the complaint on U.S.A - D.C.

336. Furthermore, Phelan intentionally did not serve the Motion to Reform the Loan Modification and the Order on parties of interest. Thus, the **unopposed** Motion was invalid because it was granted without serving on all parties of interest

337. In addition, Phelan intentionally did not serve the Motion for Entry of Default and the Order on PNC Bank, JPMorgan Chase Bank and Santander Bank. Thus, the **unopposed** Motion was invalid because it was granted without serving on all parties of interest.

338. Furthermore, the Default was not entered against U.S.A. - DC and U.S.A. - NJ at that juncture and it **never** has been entered against them as of this day. Thus, Summary Judgment was **invalid** because it was entered without the Default of U.S.A. - DC and U.S.A. - NJ.

339. In order to assure that parties of interest in the action would not oppose the complaint and the motions, Phelan knowingly and willfully did not serve the motions, the orders and the complaint on them. HSBC is liable for the action of the counsel.

340. As a result of HSBC's violations, Plaintiffs suffered damages in the form of loss of equity in their house, accumulated arrears on their mortgages, damaged credit, foreclosure action, and time and money spent in an effort to defend the action over five (5) years.

## COUNT 12
## VIOLATION OF COMMON LAW FRAUD

341. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

342. The five elements of common law fraud are: (a) a material misrepresentation of a presently existing or past fact; (b) knowledge or belief by the defendant of its falsity; (c) an intention that the other person rely on it; (d) reasonable reliance thereon by the other person; and (e) resulting damages. Indian Brand Farms, inc. v. Novartis Crop Prot., 617 F.3d 207, 210 (3d Cir. 2010) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (N.J. 1997).

343. Unlike the New Jersey Consumer Fraud Act, a claim for common law fraud requires demonstrating that the Defendant offender **knew** the statements made were false.

344. Plaintiffs' common law fraud claim set forth the basis for Wells Fargo and HSBC's knowledge that the statements made were false and that Wells Fargo and HSBC intended for Plaintiffs to rely upon them.

345. Wells Fargo developed methodical business practices designed to intentionally prevent eligible homeowners including Plaintiffs from becoming eligible for a permanent HAMP loan modification.

346. The acts of Wells Fargo and HSBC in violation of the common law fraud include but are not limited to the following:

a. Wells Fargo and HSBC made methodical, intentional false representations which it knew would cause and result in financial damages to Plaintiffs.

b. Wells Fargo knowingly and willfully did not process Shim's May mortgage payment in 2014. Wells Fargo then offered the verbal TRP to Shim without ever **intending** to modify her mortgage loan. Wells Fargo thus made a false representation to Shim. Wells Fargo **knew** it was a false offer.

c. Wells Fargo then unilaterally instructed Shim to send her payments in a confusing and varying manner, thus driving her into default. Wells Fargo thus deceived Shim.

d. Wells Fargo processed the received payments on different dates and deliberately delayed notices to Shim so that Shim was late in her payments. Wells Fargo thus made a material  misrepresentation of the fact to Shim and intended to deceive her.

e. Wells Fargo returned $2,410.95 back to Shim and then suddenly **stopped** accepting payments from her, thus causing default.

f. Wells Fargo unilaterally instructed Shim to send her payments in a confusing and varying manner without ever intending to modify her loan.

g. Wells Fargo's creation of back dated documents in the guise of having legitimate business records are illegitimate and fraudulent business practices. Shim never saw or received the verbal TRP approval document dated on February 17, 2015 that Wells Fargo produced. In fact, the verbal TRP was performed in 2014 not 2015. Wells Fargo thus made a material  misrepresentation of the fact to Shim.

h. The fee of $800 for the verbal TRP without any prior notice  was a violation of 12 C.F.R.§ 1024.41.

i. The verbal TRP was a way for Wells Fargo to unilaterally impose new amount, misapply funds and tell Shim that she was no longer eligible to pay the agreed amount of the loan because she was "late". Wells Fargo thus made a misleading representation to Shim and intended to deceive her.

j. Wells Fargo provided Shim with an illusory verbal TRP that caused an automatic lapse in her on time payments and Wells Fargo's misapplication of her mortgage payments to an unknown "suspense" account was a deceptive business conduct. Wells Fargo thus made a material misrepresentation of the fact to Shim and intended to deceive her.

k. Shim justifiably relied upon Wells Fargo's false representations and was induced by it.

l. As a result of Shim's reliance upon Well Fargo's false representations, Shim was driven into default and eventually faced foreclosure action in New Jersey court.

m. As a result of the default, Shim sustained damages, which include: foreclosure action, loss of equity on her house, accumulated arrears on her mortgage, loss of tax benefit, and damaged credit.

n. In 2018, Wells Fargo offered HAMP loan modification to Plaintiffs without ever intending to modify their mortgage loan. Wells Fargo thus made a false representation of the fact to Plaintiffs. Wells Fargo **knew** it was a false offer.

o. Wells Fargo then instructed Plaintiffs to send documents for the modification without ever intending to modify their loan.

p. The appraiser intentionally and fraudulently falsified data regarding several properties allegedly "comparable" to Plaintiffs' in order to deflate the appraisal value to $820,000. By falsely deflating the appraisal value, Wells Fargo illegally and deceitfully ensured that Plaintiffs would not qualify for the HAMP loan modifications which they should have qualified for.

q. Plaintiffs thus sent a letter to Wells Fargo addressing the issue over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Plaintiffs their HAMP loan modifications based upon the falsified appraisal report. Wells Fargo thus **knew** its appraisal report was falsely prepared. Therefore, Wells Fargo made a false representation of the fact to Plaintiffs and intended to deceive them.

r. Wells Fargo's falsifications of the appraisal report and resultant disapproval of Plaintiffs' HAMP loan modifications constitute a material misrepresentation of the fact to Plaintiffs.

s. Wells Fargo's faulty HAMP calculation software and negligent lack of oversight failed to consider Plaintiffs' loss mitigation, and consequently denied Plaintiffs their HAMP loan modifications despite being qualified for the modifications. Wells Fargo thus made a false representation of the fact to Plaintiffs and deceived them.

t. Wells Fargo unconscionably and deceptively denied Plaintiffs their HAMP loan modifications even though they met all objective requirements to receive the modification. Wells Fargo **knew** Plaintiffs were erroneously denied.

u. Wells Fargo's misrepresentations with regard to HAMP loan modification include:

(a) Creating and using an internal software that were defective, thus incorrectly calculated Plaintiffs' qualification;

(b) Failing to properly supervise its loss mitigation personnel and technical employee who developed and used the faulty internal software to determine Plaintiffs' qualification for HAMP loan modification;

(c) Making inaccurate calculation and determination of Plaintiffs' eligibility due to the faulty software, thus failing to qualify Plaintiffs for their loan modifications;

(d) Not conducting adequate testing its internal software;

(e) Failing to inform Plaintiffs that they were eligible for the loan modifications after discovering that they were erroneously denied;

(f) Concealing the faulty internal software error from 2015 through 2018.

v. Wells Fargo's omissions and representations were material since they were likely to deceive Plaintiffs about their entitlement to a HAMP loan modification and the adequacy of Wells Fargo's method for evaluating Plaintiffs' entitlement to a HAMP modification.

w. Wells Fargo thus misled Plaintiffs and induced them to rely on its omissions and false representations.

x. As a result of Plaintiffs' reliance upon Wells Fargo's false representations, Plaintiffs could not modify their mortgage loan and were not able to stop the foreclosure action. Plaintiffs thus sustained damages, which include: accumulated arrears on their mortgage, loss of tax benefit, and loss of time and money spent in an effort to defend the action

y. Wells Fargo's methodical scheme of dishonest representations to Plaintiffs concerning the receipt of their HAMP loan modification documents was a false representation of the fact to Plaintiffs within the meaning of the common law fraud as the false representations were deliberate acts to mislead and did **in fact mislead** Plaintiffs.

z. Wells Fargo's methodical scheme of dishonest representations to Plaintiffs concerning HAMP applications, the purpose of which was to **deceive the Federal Government** in order to increase the Bank's profits was a deceptive commercial practice.

aa. Phelan repeatedly made false statements regarding the services even though he **knew** he did not serve the documents on parties of interest. As such, his conduct constitutes a material misrepresentation of the fact to Plaintiffs.

bb. Phelan knowingly and willfully submitted the fraudulent USPS certified mail receipt since the tracking number still indicated that its label was created, but yet in the system as of July 17, 2021. Phelan realized that it failed to serve the Complaint on the U.S.A. - DC at that juncture and thus intentionally submitted the fraudulent receipt after seventeen (17) months from the day it claimed to serve. Phelan thus made a false representation of the fact to Plaintiffs and intended to deceive them.

cc. Phelan knowingly and willfully submitted the deficient Notice of Intention to Foreclose dated January 16, 2015 to cover up its non-compliance. Phelan submitted the same document on August 24, 2017, but intentionally **deleted** the tracking number to cover up its non-compliance. Phelan thus made a material misrepresentation of the fact to Plaintiffs and intended to deceive them.

dd. Phelan possessed a legal duty to act with reasonable prudence, caution, and care to

avoid and ensure against causing or creating an unreasonable risk of or actual harm to any party in the action including Plaintiffs who were devastatingly affected by his action in connection with the complaint, the motions and the orders. Phelan undertook the duty and made a material misrepresentation to Plaintiffs and in fact did deceive them.

ee. Plaintiffs justifiably relied upon Phelan's material misrepresentations and were induced by it.

ff. As a result of Plaintiffs' reliance upon Phelan's misrepresentations, Plaintiffs had to spend time and money in an effort to defend the foreclosure action over five (5) years. Plaintiffs thus sustained damages, which include: loss of equity on their house, accumulated arrears on their mortgage, loss of tax benefit, attorney fees, and costs of the action.

gg. HSBC commenced a foreclosure action seeking to take Plaintiffs' home. The filing of the foreclosure was **only possible** after Shim was driven to default on the loan under the verbal TRP.

hh. The acts of Defendants complained of herein possess the tendency or capacity to mislead, or create the likelihood of deception.

ii. The acts of Defendants complained of herein violate public policy, amount to an inequitable assertion of its power and position, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and other consumers.

jj. The acts of Defendants complained of herein intended to mislead Plaintiffs and induce them to rely on its omissions and false representations.

kk. The acts of Defendants complained of herein were committed knowingly and willfully

347. Plaintiffs' resulting damages include but are not limited to the following:

a. Ascertainable losses consisting of monetary loss in the form of accumulated arrears on Plaintiffs' mortgage, which is over $300,000.

b. Wells Fargo's misapplication of Plaintiffs' mortgage payments to an unknown "suspense" account.

c. Loss of time and money spent in an effort to receive the loan modification when Wells Fargo had no intention of qualifying Plaintiffs for their six (6) applications.

d. Loss of time and money spent in an effort to defend the foreclosure action over 5 years.

e. Loss of tax benefits.

    f.   Damaged credit.

    g.   Loss of opportunities to pursue refinancing and/or favorable interest rates   due to severely damaged credit.

    h.   The unlawful fee of $800 for the verbal TRP.

    i.   Significant stress causing physical injuries and emotional distress.

348. Accordingly, Plaintiffs have satisfied their burden by making clear (a) Defendants made a false representation of fact to Plaintiffs; (b) Defendants knew or believed its claim to be false; (c) Defendants intended to deceive Plaintiffs; (d) Plaintiffs believed and justifiably relied upon the misrepresentation and was induced by it; and (e) As a result of Plaintiffs' reliance upon the misrepresentation, Plaintiffs sustained damages. Accordingly, the Court should sustain this common law fraud against Wells Fargo and HSBC.

> Prosser, Law of Torts, p. 700 (3rd ed. 1964), Louis Schlesinger Co. v. Wilson, 22 N.J. 576, 585-586 (1956), Fischetto Paper Mill Supply Inc. v. Quigley Co., Inc., 3N.J. 149 152-153 (19490, Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369. 379-380 (1960).

> There is much debate about the proper charge as to the burden of proof in cases involving claims of fraud - common law - equitable or legal. Early case law would indicate that the burden of proof if equitable relief is sought is "clear and convincing." If money damages are sought the burden of proof is "preponderance." Armel v. Crewick, 71 N.J. Super. 213 (App. Div. 1961); Batka v. Liberty Mutual Fire Ins. Co., 704 F.2d 684 (3rd Cir. 1983). However, recent case law may have departed from this distinction, and applied the higher"**clear and convincing**" standard to all actions, legal or equitable. Albright v. Burns, 206 N.J. Super., 625 (App. Div. 1986); Intile Realty v. Raho, 259 N.J. Super., 438 (Law Div. 1992); Stochastic Decisions v. DiDominico, 236 N.J. Super. 388 (App. Div. 1988).

## COUNT 13
## VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

349. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

350. The Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. 2601 et seq.) requires lenders or servicers of home loans to provide borrowers with pertinent and timely disclosures regarding the nature and costs of the real estate settlement process. The goal is to promote

"more effective advance disclosure to home buyers and sellers of settlement costs." Id., § 2601(b)(1).

351. Under the RESPA, the lender **must** give notice to the borrower "not less than 15 days before the effective date of transfer of the serving of the mortgage loan." 12 U.S.C. § 2605(b)(2)(B). The lender must "notify the borrower in writing of any assignment, sale, or transfer of the servicing of the loan to any other person." Id., § 2605(b)(1). "Effective date of transfer" means "the date on which the mortgage payment of a borrower is first due to the transferee servicer of a mortgage loan pursuant to the assignment, sale, or transfer of the servicing of the mortgage loan." Id., § 2605(i)(1).

352. Shim executed a note with BNY in February 2007. The note then was endorsed to Everbank. Everbank subsequently endorsed the note to Wells Fargo. In August 2011, MERS, as nominee for BNY, assigned Shim's mortgage to HSBC. Shim's loan modification agreement dated in March 2012 indicated that Wells Fargo was the owner of her mortgage. Thereafter, the foreclosure complaint was filed by HSBC in March 2016. In May 2020, HSBC's counsel stated that a Motion to Substitute Plaintiff is required.

353 Therefore, there were a total of six (6) transfers of the ownership of Shim's loan so far, but all the transferees failed to give Shim the required notice. At no time did Shim receive such required notice. The six (6) transferees thus violated the RESPA by failing to meet the statute's requirements.

354. Shim sent a Qualified Written Request ("QWR") to Wells Fargo addressing the fraudulent appraisal issue over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Shim and Mo their loss mitigation based upon the fraudulent appraisal report. **See Exhibit J, K, L & O**. The QWR stated, "First of all, I am still waiting for your letter explaining the reason why I still do not meet the requirements for the above loan modification. Your letter dated on March 23, 2018 doesn't explain with regard to your decision. Second of all, you need to review my appeal again since your decision was

based on a fraudulently prepared appraisal report for the following reasons." The QWR palpably explained how the appraisal report was fraudulently prepared and how the appraiser violated the Uniform Standards of Professional Appraisal Practice. Shim requested the explanation of the issue over four (4) times, but **never** received a response from Wells Fargo. Neither HSBC nor Wells Fargo provided Plaintiffs with the response.

355. Under the RESPA, the servicer of a federally related mortgage loan **must** acknowledge receipt of a QWR from a borrower within twenty (20) days and **must** respond substantively to the QWR within sixty (60) days. 12 U.S.C. § 2605(e)(1)(A), (e)(2). Under RESPA, if a servicer fails to respond properly to a QWR, a mortgagor may bring a suit for any **actual damages** to the borrower as a **result** of the failure. 12 U.S.C. § 2605(f)(1)(A). Section 2605(f)(1)(A) of RESPA requires Plaintiffs to allege that actual damages flowed from the alleged violation. Section 2605(f) reads as follows:

(f) DAMAGES AND COSTS

Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

(1) INDIVIDUALS

In the case of any action by an individual, an amount equal to the sum of--

(A) any actual damages to the borrower as a result of the failure; and

(B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

356. In order to assure that Shim and Mo would not qualify for the loss mitigation,  Wells Fargo conspired to fraudulently deflate the appraisal value of their home to $820000. By falsely deflating the value of the appraisal, Wells Fargo illegally and deceitfully ensured - to Shim and Mo's direct and significant financial, personal, and legal detriment - that they would not qualify for the loss mitigation which they should have qualified for.

357. Congress granted the Bureau explicit authority to create regulations under any RESPA

section. 12 U.S.C. § 2617. RESPA Section 6(j)(3) grants the Bureau authority to "establish any requirements necessary to carry out this section." Id. §2605(j)(3). And, RESPA Section 6(k)(1)(E) provides that a "servicer of a federally related mortgage shall not ... fail to comply with any other obligation found by the Bureau ... by regulation, to be appropriate to carry out the consumer protection purposes of this Act." Id. § 2605(k)(1)(E).

358. 12 C.F.R. § 1024.41 sets forth requirements for the submission, consideration, and adoption or rejections for mortgage relief. Trudell v. Carrington Mortgage Services, LLC., Case No. 1:16-cv-10441-TLL-PTM, 2016 WL 6080822, at *6 (F.D. Mich. Sept. 27, 2016). The regulation explicitly states "[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))." 12 C.F.R. § 1024.41(a). Section 6(f) provides **a private right of action** to individuals for damages and costs incurred for failure to comply with any provision in the section. Id. § 2605(f).

359. Section 6 of RESPA addresses loan servicing and allows consumers to file **individual** action against loan servicers or owners for RESPA violations. In individual actions, loan servicers or owners may be liable for damages. If a pattern or practice of noncompliance with the servicing requirements exists, the loan servicer or owners can be liable for additional penalties for violations of RESPA of up to $1,000.

360. As a result of the RESPA violations, Plaintiffs suffered damages in the form of loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, loss of opportunity to pursue refinancing due to the damaged credit, foreclosure action, and time and money spent in an effort to defend the action over five (5) years.

361. Plaintiffs are entitled to damages as a result of the violations described herein, including statutory, actual, compensatory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial.

### COUNT 14
### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

362. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

363. The Equal Credit Opportunity Act ("ECOA") is a federal statute designed to prevent discriminatory lending practices in banks and other financial institutions or lenders. Section 1691 provides two rights to applicants. First, it requires a creditor to notify the applicant of its action on the application within thirty (30) days of receipt of a completed application. U.S.C. § 1691(d)(1). Second, where the creditor takes an adverse action with respect to an application, it is required to provide a statement of **reasons** for the denial. U.S.C. § 1691(d)(2).  Section 1691(d) reads as follows:

(d) Reason for adverse action; procedure applicable; "adverse action" defined

(1) Within thirty days (or such longer reasonable time as specified in regulation of the Bureau for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of **reasons** for such action from the creditor. A creditor satisfies this obligation by...

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which disclose (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such a statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

(4) Where a creditor has been requested by a third party to make a specific extension of credit directly or indirectly to an applicant, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly through the third party, provided in either case that the identity of the creditor is disclosed.

(5) The requirements of paragraph (2), (3), or (4) may be satisfied by verbal statements or notifications in the case of any creditor who did not act on more than one hundred and fifty applications during the calendar year preceding the calendar year in which the adverse action is taken, as determined under regulations of the Bureau.

(6) For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

364. The federal courts have found that applicants are entitled to a determination on their application within thirty days (30) whether or not they defaulted on their existing loan obligations. See Banks v. JPMorgan Chase Bank, N.A., 2014 WL 6476139, at *13 (C.D. Cal. Nov. 19, 2014) ("However, § 1691(d)(1) is not limited to adverse actions, and applies generally to completed application[s] for credit."); Vasquez v. Bank of America, N.A., 2014 WL 1614764, at *2-3 (N.D. Cal. Apr. 22, 2014).

365. Under Section 1691, an "adverse action" triggers a creditor's obligation to provide a statement of reasons, not its obligation to provide a determination within thirty days, which is triggered by the completion of the application for credit. Compare 11 U.S.C. § 1691(d)(1) with § 1691(d)(2). The phrase "adverse action" does not appear in Section 1691(d)(1). Accordingly, a plain reading of the statute confirms that creditors are required to make a determination on a completed application within thirty (30) days regardless of the status of the applicant. Neither a plain reading of the statute nor public policy supports a rule requiring a creditor to promptly resolve applications of non-defaulting applicants while permitting creditors to leave those applicants in default twisting in the wind indefinitely.

366. Here, Plaintiffs submitted six (6) complete loss mitigation applications, but all of them were recklessly denied **without** a statement of reasons for the denial. Wells Fargo's failures to send Plaintiffs a statement of reasons for the six (6) denials constitute a violation of section 1691 (d)(2) of the ECOA, regardless of Plaintiff's default status. This allegation thus is sufficient to state a claim under § 1691(d)(2), even though Plaintiffs were in default at that time.

367. The equitable tolling doctrine can **suspend** the two years statute of limitations period until the borrower discovers or has reasonable opportunity to discover the fraud or

nondisclosures. Jones v. TransOhio Sav. Ass'n., 747 F.2d 1037, 1041 (6th Cir. 1984).

368. To satisfy the standard of equitable tolling in the fraudulent concealment context, a plaintiff must establish that: " '(a) the defendant took affirmative steps to conceal the plaintiff's cause of action: and (b) the plaintiff could not have discovered the cause of action despite exercising due diligence.' " Matthews v. New Century Mortgage Corp., 185 F. Supp. 2d 874, 883 (S.D. Ohio 2002) (quoting Jarrett v. Kassel, 972 F.2d 1415, 1423 (6th Cir. 1992)); See also Mills v. Equicredit Corp., 294 F. Supp. 2d 903, 908 (E.D. Mich. 2003). Accordingly, this Court should apply the doctrine since Plaintiffs discovered the ECOA violations at the time of the filing of this action due to Defendants' concealing them and Plaintiffs' inability to discover them despite exercising due diligence.

369. As a result of the ECOA violations, Plaintiffs suffered damages in the form of loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, foreclosure action, and time and money spent in an effort to defend the action over five (5) years.

**COUNT 15**
**VIOLATION OF THE FAIR HOUSING ACT**

370. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

371. The Fair Housing Act ("FHA") provides a right of action for private citizens against those who discriminate against them in the housing market. See 42 U.S.C. § 3613(a)(2015). Under the FHA, it is unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin. 42 U.S.C. § 3605(a).

372. A plaintiff must allege that they were discriminated against within the meaning of the FHA by showing either discriminatory intent or discriminatory impact. Robinson v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty., MD, No. CIV. A. RDB-07-1903, 2008 WL 2484936, at *9 (D. Md. June 19, 2008) (citing Betsey v. Turtle Creek Assocs., 736 F.2d 983, 986 (4th Cir. 1984)).

373. To allege discriminatory intent under the FHA, a plaintiff may either offer direct evidence of discrimination or invoke the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework. Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1451 (4th Cir. 1990). In this context, "[d]irect evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and bear directly on the contested housing decision." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013) (quoting March v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006)) (internal quotation marks omitted).

374. Under the McDonnell Douglas burden-shifting framework, a plaintiff need not show that discriminatory animus was the primary or dominant purpose, but only that it was a motivating factor. Smith & Lee Assocs., Inc. v. City of Taylor, 102 F.3d 781, 790 (6th Cir. 1996). At trial, if the plaintiff can establish that the defendant's action was based, at least in part, on discriminatory animus, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for their actions. McDonnell Douglas, 411 U.S. at 802-05. After the defendant establishes a legitimate, nondiscriminatory reason for its actions, the burden returns to the plaintiff to rebut that reason as mere pretext. However, a plaintiff "need not plead a prima facie case of discrimination ... to survive [a] motion to dismiss." Swierkiewicz, 534 U.S. at 515. While a plaintiff is not required to plead facts that constitute a prima facie case of discrimination in order to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly v. Iqbal, 550 U.S. at 555; accord McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., F.3d, No. 13-2488, 2015 WL 1088931, at *3 (4th Cir. March 13, 2015).

375. Here, Wells Fargo's conduct pertaining to Shim and Mo's loan modification reflected a discriminatory attitude and bore directly on the loan modification in the following manner.

(a) Wells Fargo recklessly denied Shim and Mo their complete six (6) loan modification applications even though their combined incomes were over $200,000 which was more than enough to be qualified for their expected monthly payment of about $4,500.

(b) Shim thus sent a letter to Wells Fargo addressing the incorrect calculation of their

incomes and falsified appraisal over **four** (4) times, but the issue was never solved during the entire loss mitigation and Wells Fargo continually denied Shim and Mo their loss mitigation based on the incorrect calculation of their incomes and fraudulent appraisal report.

(c) Shim thus faxed a letter to Wells Fargo over **four** (4) times explaining how the appraisal report was fraudulently prepared and how Wells Fargo wrongly calculated their incomes, but Wells Fargo did not take any actions at all. Wells Fargo's conduct reflected a clear and direct evidence of discriminatory intent and also was a plausible basis for discrimination under the McDonnell Douglas standard.

(d) Shim thus asked Wells Fargo over **four** (4) times what basis or bases their loan modification was denied, but Wells Fargo did not respond at all. Wells Fargo's practice was motivated by intentional discrimination.

(e) Shim and Mo's third loan modification was denied **only** after five (5) days and their fifth modification was denied **only** after four (4) days. Wells Fargo thus committed extreme discriminatory attitude against Shim and Mo.

(f) All of the six (6) loan modification applications were denied without a specific reason or reasons.

(g) Wells Fargo's discriminatory attitude thus bore directly on the denials of the six (6) applications, because other similarly situated non-minority applicants **received** a loan, while Shim and Mo, an Asian couple, did not.

(h) Accordingly, discriminatory animus was a motivating factor in Wells Fargo's decision to deny Shim and Mo's loan modifications, which lay the foundation for a plausible claim that Shim and Mo's status as an Asian couple had clear and direct bearing on Wells Fargo's loan modification to them in their individual capacity.

376. To allege discriminatory impact under the FHA, a plaintiff must show that a specific policy caused a significant disparate effect on a protected group. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988). A plaintiff must identify the neutral practice at issue and cite statistical evidence demonstrating the discriminatory impact caused by the practice. Plaintiffs, as members of a discrete minority, are required to prove "that a given policy had a discriminatory impact on them as individuals." Betsey, 736 F.2d at 987. After a plaintiff makes this initial showing, the burden shifts to the defendant, to "prove a business necessity sufficiently compelling to justify the challenged practice."

377. Here, Wells Fargo's facially nondiscriminatory loan programs had a discriminatory impact on minority applicants, which was subject to Wells Fargo's alleged discrimination. Wells Fargo's discriminatory practices affected Shim and Mo as an individual, because its policies had a discriminatory impact on minority applicants compared to similarly situated non-minority applicants.

378. In July 2012, the Department of Justice filed the largest fair lending settlement in the department's history to resolve allegations that Wells Fargo engaged in a pattern or practice of discrimination against qualified minority borrowers in its mortgage lending from 2004 through 2009. The settlement provided $184.3 million in compensation for minority borrowers who were steered into subprime mortgages or who paid higher fees and rates than non-minority borrowers because of their race or national origin. Additionally, Wells Fargo agreed to conduct an internal review of its mortgage lending practice and will compensate minority borrowers who were placed into subprime loans when similarly qualified non-minority borrowers **received** prime loans. Compensation paid to any minority borrowers identified in the review process would be in addition to the $184.3 million to compensate the minority borrowers who were victims of discrimination. **See Exhibit EE**.

379. In December 2019, the City of Philadelphia reached a settlement in its 2017 lawsuit with Wells Fargo & Co. (City of Philadelphia v. Wells Fargo & Co., et al., E.D. Pa. 2:17-cv-02203) over allegations of discriminatory lending practices in violation of the FHA with the bank agreeing to contribute $10 million for sustainable housing-related programs for low-and moderate-income resident. The lawsuit alleged that beginning in 2004 and continuing through 2019, Wells Fargo violated the FHA by steering non-minority borrowers towards high-cost or high-risk loans even when those borrowers' credit and incomes permitted them to obtain more advantageous loans. The lawsuit also claimed that Wells Fargo was aware of this alleged practice and, in fact, incentivized the marketing of the high-cost or high-risk loans to minorities.

380. The floodgates for FHA claims against Wells Fargo opened when the U.S. Supreme

Court ruled on May 1, 2017 in a lawsuit brought by the city of Miami that municipalities could sue Wells Fargo over allegations that predatory lending practices in minority communities violated the FHA and contributed to a real estate meltdown that nearly bankrupted the city. In filing its case, Philadelphia officials noted that the U.S. Department of Justice and numerous cities **including** Los Angeles, Oakland, Miami, Baltimore, Memphis and Miami Gardens have already filed similar lawsuits against Wells Fargo. **More** have filed similar complaints since that time.

381. Accordingly, Wells Fargo's discriminatory practices affected Shim and Mo as an individual, because its mortgage lending practices and policies had a discriminatory impact and attitude on minority applicants compared to similarly situated non-minority applicants. Wells Fargo's mortgage loan lending policies resulted in discriminatory impact on Shim and Mo and as a result, their six (6) loan modifications were recklessly denied even though they were fully qualified.

382. As a result of the FHA violations, Plaintiffs suffered damages in the form of loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, foreclosure action, and time and money spent in an effort to defend the action over five (5) years.

### COUNT 16
### VIOLATION OF THE FAIR CREDIT REPORTING ACT

383. Plaintiffs repeat and adopt all prior paragraphs of this pleading.

384. The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., is the U.S. Federal Government legislation enacted to promote the accuracy, fairness, and privacy of consumer information contained in the files of consumer reporting agencies.

385. Relevant here, Shim alleges that HSBC and Wells Fargo were in violation of the FCRA, 15 U.S.C. § 1681s-2(b), based on its inaccurate and misleading reporting of the foreclosure action to credit reporting agencies. HSBC and Wells Fargo caused an adverse account to appear on Shim's credit report even though they were not entitled to do so.

386. The crux of this cause of action involves the meaning of the term "accuracy" as it is used in the statute. It was inaccurate for HSBC to report on Shim's credit report that her mortgage was in a "collection status" and that foreclosure proceedings had been commenced because, in reality, Wells Fargo deceptively drove her into default and HSBC had never been the owner of her mortgage loan. Shim thus never defaulted and HSBC was absolutely **not** entitled to report the default to consumer reporting agencies as an owner of her mortgage loan.

387. Several courts have held that "[a] credit entry may be 'inaccurate' within the meaning of the statute either because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decision." Sepulvado v. CSC Credit Servs., Inc., 158 F.3d 890, 895 (5th Cir. 1998) (citing Pinner v. Schmidt, 805 F.2d 1258 (5th Cir. 1986) ( finding violation of FCRA where consumer reporting agency marked credit entry "litigation pending" without specifying that it was plaintiff/obligor who had initiated suit against creditor)); see Carvalho v. Equifax Info. Servs., LLC, 629 F. 3d 876, 891 (9th Cir. 2010) (adopting "patently incorrect or materially misleading" standard); Sanders v. Branch Banking & Trust Co. of Va., 526 F.3d 142, 148 (4th Cir. 2008) ("[A] consumer report that contains technically accurate information may be deemed '**inaccurate**' if the statement is presented in such a way that it creates a misleading impression."); Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 42, 236 U.S. App. D.C. 136 (D.C. Cir. 1984) (holding that the plaintiff may **pursue** FCRA claim even though the report is technically accurate, so long as it is shown that such reports are **not accurate** to the maximum possible extent) Fitzgerald v. Chase Home Fin., LLC, No 10-cv-4148, 2011 WL 9195046, at *10-*11, 2011 U.S. Dist. LEXIS 156395, at *31-*33 (S.D.N.Y. Feb. 28, 2011).

388. Noting that a rule requiring only technical accuracy in credit reporting would **contravene** the legislative intent behind the FCRA, the court in Fitzgerald "adopted the rule from Sepulvado and the approach of the Fourth, Fifth, Ninth, and District of Columbia Circuits," which authorizes recovery by consumers whose credit report, though accurate on its face, may nevertheless be

73

unfairly misleading. Subsequently, in Wenning v. On-Site Manager, Inc., No. 14-cv-9693, 2016 WL 3538379, at *9, 2016 U.S. Dist. LEXIS 81126, at *27 (S.D.N.Y. June 22, 2016), another district court noted that, as set forth in Fitzgerald, "[t]he overwhelming weight of authority" supports a less rigid approach to the accuracy analysis, and that "[o]nly one Circuit had clearly adopted the competing technical accuracy test. Therefore, it, too, adopted the materially misleading standard. Guided by these authorities, the more flexible approach mandated by the materially misleading standard is appropriate, and provides a method of evaluating compliance with the FCRA that is more closely aligned than its rigid counterpart with the statute's purpose of addressing the serious problem in the credit reporting industry … of inaccurate or **misleading** information. Koropoulos, 734 F.2d at 40 n.4. (citations omitted).

389. Applying this standard, HSBC consistently reported in Shim's credit file that legal proceedings had been commenced to foreclose her mortgage because her account was past due. However, while apparently technically true, this information was misleading and inaccurate. A question of fact appears to exist as to whether, given the fact regarding the allegedly wrongful foreclosure action, the selective information provided by HSBC to the credit reporting agencies was misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions. Sepulvado, 158 F.3d at 895. In fact, this information did adversely impact the Shim's credit rating and access to a refinancing of her mortgage as well as other credit applications. Accordingly, this is **sufficient** to pass Rule 12(b)(6) muster. See Fitzgerald, 2011 WL 9195046, at *10-*11, 2011 U.S. Dist. LEXIS 156395, at *33-*34.

390. As a result of the FCRA violations, Plaintiffs suffered damages in the form of loss of equity in their house, accumulated arrears on their mortgage, loss of tax benefits, damaged credit, loss of opportunities to pursue refinancing of her mortgage and other credit applications due to the damaged credit, foreclosure action, and time and money spent in an effort to defend the action over five (5) years.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendants as follows:

a. For damages as a result of Defendants' unfair, unlawful, deceptive, and unconscionable practices described herein, including actual, statutory, punitive, and/or trebled damages to the extent permitted by law in an amount to be proven at trial;

b. For equitable relief as a result of Defendant's unfair, unlawful, deceptive, and unconscionable practices described herein, including restitution to the extent

c. permitted by law in an amount to be proven at trial;

d. Appropriate declaratory relief against Defendants;

e. Preliminary and permanent injunctive relief against Defendants;

f. For a declaration that HSBC filed a wrongful foreclosure action;

g. Forfeit accumulated arrears on Plaintiff's mortgage since January 1, 2014;

h. Judgment against Defendants for Plaintiff's asserted causes of action;

i. For both pre-judgment and post-judgment interest on any amounts awarded;

j. The unlawful fee of $800 for the verbal TRP;

k. An award of all applicable damages;

l. An award of reasonable litigation costs incurred; and,

m. Such other and further relief as the Court may deem proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury.

Respectfully submitted,

Dated:  12/02/21

By: _____
    Sung H. Mo